RANDALL B. HOBSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hobson v. Commissioner
Docket No. 14850-89.
United States Tax Court
T.C. Memo 1992-312; 1992 Tax Ct. Memo LEXIS 334; 63 T.C.M. (CCH) 3085; June 2, 1992, Filed *334 Decision will be entered under Rule 155. William T. Ramsey, for petitioner. Vallie C. Brooks, for respondent. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined the following deficiencies in and additions to petitioner's Federal income taxes: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
1984
$ 412,711.72
$ 20,635.59
[1]
$ 103,178
1985
279,765.37
33,988.27
[1]
69,941
The issues for decision are: (1) whether funds petitioner misapplied in 1984 and 1985 from the bank in which he was employed constitute gross income to him in those years within the meaning of section 61. We hold that funds petitioner misapplied and diverted to accounts owned by petitioner, funds misapplied and diverted to a related corporation in which petitioner had a 25-percent interest, and funds misapplied and taken by petitioner in cash are gross income and are taxable to him in the years the funds *335 were misapplied. However, funds misapplied and diverted to accounts of bank customers who consensually recognized that such advances must be repaid to the bank are not gross income to petitioner within the meaning of section 61; and (2) whether petitioner is liable for additions to tax under sections 6653(a)(1) and (2) and 6661 for the years at issue. We hold that he is liable for the additions to tax under section 6653(a)(1) and (2) for 1984 and 1985, and section 6661 for 1984 on the deficiencies redetermined in accordance with our holding stated above. All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. Petitioner resided in Pulaski, Tennessee, at the time he filed his petition. Petitioner was the branch manager of the Minor Hill Road branch of the Bank of Giles County (the bank) during 1984 and until April 17, 1985. Petitioner began working for the bank in 1974 at the age of 22 and became a branch manager in 1980, holding that position until April 17, 1985. Petitioner *336 received a degree in business management from Middle Tennessee State University. One of the bank's customers was Jack M. McComiskey (McComiskey). McComiskey was self-employed in a variety of businesses in Tennessee at different times from the late seventies through the years at issue. McComiskey's businesses included farming, repairing and refurbishing tractor-truck trailers, purchasing and demolishing old buildings to salvage and sell scrap materials, and cutting cedar wood into cedar shavings. McComiskey had been a customer of the bank since the late seventies. During the early eighties, McComiskey experienced financial difficulties. At this time, his primary business was the salvage operation described above. Petitioner had caused the bank legally to loan McComiskey substantial sums of money for the purchases of properties obtained in the course of McComiskey's salvage business. Unfortunately, the properties and salvaged materials failed to produce sufficient revenue to service McComiskey's bank debt in a timely fashion. Petitioner believed that McComiskey's credit was overextended. McComiskey approached petitioner with a business plan to purchase and modify certain equipment *337 to cut cedar wood into cedar shavings for wholesale. McComiskey displayed an understanding of the necessary equipment, how to properly modify it, and sell the product. Although petitioner thought McComiskey's present financial situation precluded additional loan approval under the bank's lending limit guidelines, he liked McComiskey's earnings projections for the cedar shavings business. Believing that success in the cedar shavings business would enhance McComiskey's ability to service McComiskey's demolition business bank debt and help restore a profitable bank customer, petitioner told McComiskey that he could "work it out". Petitioner began to assist McComiskey financially in this regard in March and May 1981 by posting short-term deposits in McComiskey's account to cover checks that would otherwise overdraw the account. These surreptitiously deposited funds, which ranged from $ 3,100 to $ 14,850 during this time period, were then withdrawn from McComiskey's account by petitioner within the next several days after McComiskey could replenish his account. Thus, petitioner caused the bank to provide unapproved and undocumented overdraft protection to McComiskey. In addition, *338 McComiskey's overdrafts did not appear on the overdraft report supplied to the bank's executive committee. Petitioner engaged in the same type of unapproved activity for other bank customers. Separately, in 1984, petitioner diverted $ 26,257.60 to the business account of Aerobics in Action. Petitioner did not subsequently withdraw these funds from that account and, thus, the bank sustained a loss of $ 26,257.60. Eventually, petitioner's methods of assisting McComiskey, as well as the amount of money advanced, expanded. While McComiskey's cedar shavings business was producing some cash inflows, McComiskey was still expending more money on the business than it produced. Therefore, in an effort to further assist McComiskey, petitioner extended loans to Larry and Jimmy Hendrick (the Hendricks) without obtaining the required bank approval. These loans were made specifically to enable the Hendricks to purchase certain real estate owned by McComiskey. Petitioner also refinanced some of McComiskey's outstanding loans owed to the bank, again without the proper bank approval. In addition, petitioner began to deposit bank funds into McComiskey's business account, J.M. Wood Products, *339 by making illegitimate and fictitious credits for the benefit of McComiskey which credits were offset by debits to other bank loan accounts. Petitioner also authorized cash withdrawals and issued cashier's checks based on fictitious loans made in the names of other bank customers without their knowledge or approval. Finally, searching for an additional source from which to divert bank funds, petitioner used the bank's receipts as a collecting agent for South Central Bell Telephone Co. Petitioner generally used these later funds to make payments, usually interest payments, on the fictitious, illegitimate loans in the names of unsuspecting customers. Unlike earlier illegitimate deposits, these loans were not serviced or covered from subsequent legitimate deposits into McComiskey's account and, thus, ultimately became financial losses to the bank. This practice continued during 1984 and 1985 until petitioner was dismissed by the bank on April 17, 1985. McComiskey understood that the illegitimate deposits were advances from the bank that were required to be repaid to the bank. Petitioner's misappropriations of bank funds were discovered by May 1985. On March 29, 1986, petitioner *340 pled guilty to charges that he embezzled and willfully misapplied bank funds in violation of 18 U.S.C. section 656. Specifically, the information to which petitioner pled guilty charged that petitioner diverted "funds to one or more accounts held in the name of or controlled by John (Jack) McComiskey. Said misapplications were accomplished by creating bogus loans and by diverting funds from other customers' accounts". Petitioner diverted $ 832,581 and $ 589,863.28 in 1984 and 1985, respectively, from the bank. Of these amounts, petitioner diverted $ 99,458 from the bank and deposited it into his Prudential Bache account during 1984 and diverted $ 6,578.11 to Furniture World, and $ 5,100 in cash in 1985. Petitioner owned 25 percent of Furniture World during 1985. Except for the $ 26,257.60 diverted to Aerobics in Action in 1984, the balance of the misappropriated funds during 1984 and 1985 was diverted to and for the benefit of McComiskey. In 1986, in settlement of a lawsuit filed against petitioner by the bank, petitioner conveyed certain assets to the bank and signed a promissory note for $ 1.3 million to compensate the bank for its losses. OPINION Respondent asserts that *341 petitioner embezzled for his purposes, whatever they might be, and therefore the embezzled funds constitute gross income to him in the year that he embezzled them. It is well settled that profits or gains earned illegally constitute gross income within the meaning of section 61. James v. United States, 366 U.S. 213 (1961). However, in circumstances where misappropriations do not enrich or benefit the misappropriator, and there is a consensual recognition of an obligation to repay the funds, income does not arise. Beasley v. Commissioner, T.C. Memo. 1989-173; Ocean Sands Holding Corp. v. Commissioner, T.C. Memo. 1980-423; see also Gilbert v. Commissioner, 552 F.2d 478 (2d Cir. 1977), revg. T.C. Memo. 1976-104. This case falls substantially into this latter category. The Supreme Court's decision in James v. United States, supra, firmly established the principle that embezzled funds are income to the embezzler. That decision, however, does not stand for the proposition that all misappropriated funds are gross income of the person who illegally misapplied the *342 funds. The decision necessarily confines taxation of an embezzler to circumstances where the embezzler receives a sufficiently cognizable benefit under the normal principles of income taxation. The Supreme Court began with the "starting point in all cases dealing with the question of the scope of what is included in 'gross income' * * * that the purpose of Congress was 'to use the full measure of its taxing power'." James v. United States, supra at 218 (quoting Helvering v. Clifford, 309 U.S. 331, 334 (1940)). The Court referred to its oft-quoted language describing the breadth of Congress' intent regarding the statutory definition of gross income: all "'accessions to wealth, clearly realized, and over which the taxpayers have complete dominion'." James v. United States, supra at 219 (quoting Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955)). The Court refined this definition by noting that such a gain exists when the "'recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it'." James v. United States, supra at 219 *343 (quoting Rutkin v. United States, 343 U.S. 130, 137 (1952)). Turning to embezzlement income in particular, the Court stated that a taxpayer has income when he "acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition". James v. United States, supra. The Court also expressly held that income from such "wrongful appropriations" excludes loans. Id. at 219. The Court's holding contemplates taxable embezzlement income to be that obtained in the typical embezzlement situations where taxpayers "enrich themselves". Id. at 221. Thus, the Court recognized that income realization does not result in every case involving a misapplication of funds. Petitioner argues that the facts of this case are beyond the James v. United States, supra, definition of embezzlement income. Petitioner argues that because petitioner did not benefit from the advances to McComiskey, and because McComiskey knew that the funds were being advanced to him or for his benefit and consensually *344 recognized the obligation to repay the bank, there was no embezzlement within the intendment of the Supreme Court's use of the term in James v. United States, supra. McComiskey testified at trial that he knew he was obligated to repay the bank the amounts advanced and expected to do so. It is clear that where a taxpayer misappropriates funds for the benefit of a related party or where he ultimately receives a benefit from the defalcation, he has received a readily realizable economic value and has been enriched by it. For example, in Bailey v. Commissioner, 52 T.C. 115 (1969), the taxpayer, a bank employee, embezzeled funds by crediting her brother's account with deposits that were never made. We held in that case that the taxpayer, "induced through considerations of blood relationship", embezzled the funds from her employer instead of advancing her own money and benefited thereby. Id. at 118. We concluded that she embezzled the funds, and then gifted them to her brother. Id.; see also Estate of Geiger v. Commissioner, 352 F.2d 221 (8th Cir. 1965), affg. T.C. Memo. 1964-153. *345 This case is unlike such a traditional embezzlement case. McComiskey knew the illegitimate deposits were advances from the bank, that he was the ultimate obligor, and that, at some point, he would have to pay the money back to the bank. This was so whether or not the advances were made in accordance with bank policy and regardless of the possibility of the illegality of the deposits or other advances. Petitioner did not personally benefit from these advances. We cannot accept respondent's contention that petitioner benefited from later misapplications to the extent that they covered prior misapplications, because we conclude that the bank's customers consensually recognized that the advances would have to be repaid to the bank. Therefore, we hold that those funds misappropriated and advanced to McComiskey's accounts, as well as the funds advanced to the Hendricks for the purpose of purchasing McComiskey's real estate, are not includable in petitioner's gross income for the years at issue. Similarly, petitioner personally did not benefit from the funds advanced to Aerobics in Action. These advances were not gross income to petitioner. We do not reach the same conclusion, however, *346 with respect to the funds that petitioner misappropriated into his own brokerage account, diverted to Furniture World, a related corporation, or took in cash. We hold that these funds constitute embezzlement income to petitioner. Petitioner argues that he is entitled to a deduction for a partial repayment in 1985 of the misappropriated funds. There is no evidence in the record that any restitution occurred in 1985. In 1986, petitioner transferred certain assets to the bank in restitution. However, the year 1986 is not before us. We also must address whether petitioner is liable for the additions to tax under sections 6653(a)(1) and (2) and 6661. Section 6653(a)(1) and (2) imposes an addition to tax if any part of the underpayment of tax is due to negligence. An underpayment exists when a statutory deficiency exists. Sec. 6211(a). We have held that the amounts diverted to petitioner's Prudential Bache brokerage account during 1984 and the funds diverted to a related corporation and the funds taken in cash in 1985 constitute gross income to him. Thus, there can be no dispute that there are underpayments by petitioner for the years at issue. Petitioner's liability for the *347 additions to tax under section 6653(a), therefore, turns on the existence of negligence by petitioner in the preparation of the returns. Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Crocker v. Commissioner, 92 T.C. 899, 916 (1989); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination is presumed to be correct, and petitioner has the burden to prove that it was erroneous. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757 (1972). We have held that petitioner's misappropriations diverted to his own accounts constitute embezzlement income to petitioner and should have been reported. Unlike the funds advanced to McComiskey and Aerobics in Action as loans, petitioner had the use and benefit of these funds. A reasonable and ordinarily prudent person who had such funds under his dominion and control and who was able to use such funds for his own purposes would have questioned whether such funds constituted income. Petitioner was negligent in not reporting such monies as income. Therefore, we hold petitioner is liable *348 for the additions to tax for negligence under section 6653(a)(1) and (2) for the years at issue in amounts based on deficiencies determined in accordance with our holding above. Respondent also determined that petitioner substantially understated his income tax liabilities, making him liable for the additions to tax under section 6661. The amount of a section 6661 addition to tax assessed after October 21, 1986, is 25 percent of the amount of any underpayment attributable to such substantial understatement. Sec. 6661(a); Pallottini v. Commissioner, 90 T.C. 498, 500-503 (1988). An understatement is substantial if the amount of the understatement for the tax year is more than $ 5,000 or greater than 10 percent of the amount required to be shown on the return. Sec. 6661(b)(1)(A)(i) and (ii). Petitioner did not argue that the return adequately disclosed facts regarding the understatement or that substantial authority supported his return position. Sec. 6661(b)(2)(B). The applicability of this addition to tax turns on the redetermination of petitioner's tax liabilities for 1984 and 1985 in accordance with this opinion. We leave that calculation to the parties. *349 Decision will be entered under Rule 155. Footnotes
1. 50 percent of the interest due on the deficiency.↩