# United States Tax Court

T.C. Memo. 2024-66

ROBERT W. SMILEY, JR., AN INCOMPETENT PERSON,
MARGARET T. SMILEY, GUARDIAN, ET AL.,[1]
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket Nos. 29644-12, 5314-16,
5315-16, 5318-16.

Filed June 17, 2024.

————————

*David B. Shiner*, *Daniel J. Fumagalli*, *John Patrick Adams*, and *Albert Leon Grasso*, for petitioner in Docket No. 29644-12.

*David B. Shiner* and *Daniel J. Fumagalli*, for petitioners in Docket Nos. 5314-16, 5315-16, and 5318-16.

*Noelle White*, *David Weiner*, *Maria Cerina De Ramos*, and *Patricia P. Wang*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, *Judge*: At the root of these consolidated cases is a scheme devised by petitioner Robert W. Smiley, Jr. (Robert)—a U.S. Navy veteran, attorney, and published authority on employee stock ownership

---

[1] Cases of the following petitioners are consolidated herewith: Margaret T. Smiley, Docket No. 5314-16; Robert W. Smiley, Jr., An Incompetent Person, Margaret T. Smiley, Guardian, Docket No. 5315-16; and Benefit Capital Holdings, Inc., Docket No. 5318-16. Cases of the following petitioners were previously consolidated herewith but have since been resolved by entry of stipulated decisions: Deerco, Inc., Docket Nos. 26812-12 and 26052-13; and Medford, Inc., Docket Nos. 27243-15 and 5316-16.

[*2] plans (ESOPs)—for the purpose of evading federal income tax due on money he extracted for his own use from an overfunded pension plan.

Following a series of examinations, respondent determined that Robert is liable for the following deficiencies, additions to tax under section 6651(a),[2] and accuracy-related penalties under section 6662(a) and (b)(2):

| Year | Deficiency | Additions to Tax/Penalties | | |
|---|---|---|---|---|
| | | § 6651(a)(1) | § 6651(a)(2) | § 6662(a) |
| 2008 | $2,297,759 | — | — | $459,551.80 |
| 2009 | 850,037 | — | — | 170,007.40 |
| 2010 | 379,653 | $68,337.54 | $94,913.25 | — |

In an Amendment to Answer filed in the case at Docket No. 29644-12, respondent further asserted that for 2008 Robert is liable for an increased deficiency totaling $8,404,559 and a civil fraud penalty under section 6663(a) of $6,303,419. As an alternative to the fraud penalty, respondent asserted that Robert is liable for an increased section 6662(a) penalty totaling $1,680,912.

Respondent also determined that Robert's spouse, petitioner Margaret T. Smiley (Margaret), is liable for deficiencies, an addition to tax, and accuracy-related penalties under section 6662(a) and (b)(2) as follows:

| Year | Deficiency | Additions to Tax/Penalties | |
|---|---|---|---|
| | | § 6651(a)(1) | § 6662(a) |
| 2009 | $240,977 | — | $48,195.40 |
| 2010 | 91,196 | $22,412.25 | 18,239.20 |

In addition, respondent determined that petitioner Benefit Capital Holdings, Inc. (BCH), is liable for deficiencies, additions to tax, and an accuracy-related penalty under section 6662(a) and (b)(1) as follows:

---

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*3]

| Year | Deficiency | Additions to Tax/Penalties | | |
|------|-----------|-------------|------------|-----------|
| | | § 6651(a)(1) | § 6651(a)(2) | § 6662(a) |
| 2009 | $1,880,175 | — | — | $376,035 |
| 2010 | 31,789 | $7,152.53 | $7,947.25 | — |

After concessions,[3] the issues remaining for decision are whether (1) Robert received and failed to report income totaling $22,578,000 for 2008; (2) Robert substantiated his claim for a short-term capital loss of $1,774,990 for 2008; (3) assessment of the deficiency determined against Margaret for 2009 is barred by the running of the section 6501(a) limitations period; (4) Robert or Margaret received and failed to report income of $907,024 for 2009 from BCH's payment of their personal expenses;[4] (5) Robert is liable for a fraud penalty or an accuracy-related penalty for 2008; and (6) Robert and Margaret are each liable for accuracy-related penalties and additions to tax as determined for 2009 and 2010.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The parties' Stipulation of Facts, the Exhibits attached thereto, and the parties' Stipulations of Settled Issues[5] are incorporated herein by this reference.

---

[3] Robert and Margaret have conceded the following issues relating to what the parties refer to as the "MARB transaction": (1) in the case at Docket No. 29644-12, Robert concedes his claim for a long-term capital loss of $1,950,000 for 2008; (2) in the case at Docket No. 5315-16, Robert concedes his claims for long-term capital losses of $1,555,000 and $1,309,000 for 2009 and 2010, respectively; and (3) in the case at Docket No. 5314-16, Margaret concedes her claims for long-term capital losses of $490,000 and $485,000 for 2009 and 2010, respectively. In the case at Docket No. 5318-16, respondent concedes an adjustment of $28,860 to BCH's income for 2010. BCH concedes all other issues in that case except that it reserves a claim for a business expense deduction under section 162 if the Court determines that Robert received compensation income from BCH for 2009. Additionally, the parties have stipulated that the assertion of the section 6663(a) fraud penalty against Robert for 2008 meets the supervisory approval requirements of section 6751(b).

[4] Respondent determined that this amount should be treated as either compensation income to Robert or a constructive dividend to Margaret. Respondent acknowledges that this is a "whipsaw" position, *see, e.g.*, *Fayeghi v. Commissioner*, 211 F.3d 504, 508 (9th Cir. 2000), *aff'g* T.C. Memo. 1998-297, taken to mitigate the risk that the amount in question might escape taxation if his position with respect to one of the possible recipients is not sustained.

[5] The parties filed Stipulations of Settled Issues in the cases at Docket Nos. 29644-12 and 5318-16.

**[*4]** I.    *Petitioners*

    A.    *Robert and Margaret*

When they timely filed their respective Petitions in these cases, Robert and Margaret both resided in Nevada. They were married at all times relevant to these cases and remain so.

Robert presently suffers from dementia and lives in a memory care facility. By order entered May 1, 2019, the District Court of Clark County, Nevada, appointed Margaret as Robert's guardian. We thereafter authorized Margaret, in her capacity as Robert's guardian, to proceed on his behalf with the cases at Docket Nos. 29644-12 and 5315-16. *See* Rule 63(b).

    1.    *Robert's professional career*

Robert was honorably discharged from the Navy in 1964 after serving in a combat zone off the coast of Vietnam. He thereafter became an attorney and was a member of the State Bar of California during the taxable years at issue in these cases. He also served on the faculty of the University of California, Los Angeles.

During his career Robert held himself out as a leading expert on ESOPs and their implementation. An ESOP is a type of employee benefit plan that, to function as intended, must be what is referred to as a "qualified plan." *See Petersen v. Commissioner*, 148 T.C. 463, 476 (2017), *aff'd and remanded*, 924 F.3d 1111 (10th Cir. 2019); *Val Lanes Recreation Ctr. Corp. v. Commissioner*, T.C. Memo. 2018-92, at *12. An essential component of a qualified plan is a trust meeting the requirements of section 401(a), which is exempt from taxation under section 501(a) and provides significant tax benefits to both the sponsoring employer and its employees. *See Fam. Chiropractic Sports Inj. & Rehab Clinic, Inc. v. Commissioner*, T.C. Memo. 2016-10, at *11; *Ronald R. Pawlak, P.C. v. Commissioner*, T.C. Memo. 1995-7, 69 T.C.M. (CCH) 1603, 1606 & n.8.

Robert was a frequent speaker and author on topics involving tax-advantaged corporate financing techniques for management and employee buyouts. He was a founder and past president of a nonprofit trade association called the ESOP Association, a past director of the National Center for Employee Ownership, and a former trustee of the Employee Ownership Foundation. Additionally, he was the managing editor and a coauthor of a treatise titled *Employee Stock Ownership*

**[*5]** *Plans: ESOP Planning, Financing, Implementation, Law and Taxation*, which was first published in 1989. A subsequent edition of the treatise was published in 2007 and updated annually through 2013. Robert was also a founding editor of *The Journal of Employee Ownership Law and Finance*, to which he was a contributing author as well.

In addition, Robert was the founder, chairman of the board, and a managing director of the Benefit Capital Cos., a national group of merchant banking and financial advisory firms that was headquartered in Nevada and had offices in California, New York, Texas, and Hawaii. Robert's work at the Benefit Capital Cos. involved using ESOPs and other tax-advantaged financing techniques to implement management and employee buyouts.

During 2007 and 2008 Robert also worked with companies to acquire other businesses that had overfunded pension plans (i.e., plans holding more assets than necessary to fund their obligations). Robert and others who engaged in similar acquisitions were aware of a method for extracting excess assets from an overfunded pension plan through a process involving a merger of the overfunded plan with another pension plan sponsored by an entity that was exempt from federal income tax. This method was designed to avoid a reversion of the excess assets to the sponsor of the overfunded plan that would subject the reverted assets to federal income and excise taxes at a combined rate as high as 85%. *See* §§ 11(b),[6] 4980(a), (c)(1)(A), (d)(1). In a 2005 interview, Robert described the tax treatment of reversions of excess assets in defined benefit pension plans as "nearly confiscatory."

### 2. *Robert's banking practices*

Robert banked with Bank of America, where he held a personal checking account during 2008. He used a Bank of America branch at a grocery store in Gardnerville, Nevada, to make transactions on his own behalf and also on behalf of his business entities. Gardnerville is about an eight-hour drive from the residence where Robert and Margaret lived at the time of the events underlying these cases. However, Robert liked one of the tellers at the Gardnerville Bank of America branch, who would make transactions for him by telephone. Transactions made by

---

[6] For taxable years beginning after December 31, 2017, Congress reduced the federal income tax rate applicable to corporations from a maximum of 35% to a flat rate of 21%. *See* Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 13001(a), (c), 131 Stat. 2054, 2096, 2098.

[*6] that teller would appear on bank statements as "NV TLR Transfer," instead of indicating the entity that had originated the transaction.

### B. *BCH*

BCH is a Nevada corporation that had its principal place of business in Illinois when it filed its Petition. Robert was the sole officer of BCH during the taxable years at issue, having served as BCH's president, secretary, and treasurer from the date of its incorporation in 1990 until September 2019. Since then, Margaret has served as the president, secretary, and treasurer of BCH. Margaret also held 90% of the stock in BCH during the taxable years involved in these cases.

### II. *Sale of Schnadig Corp.*

In 2007 the officers of Schnadig Corp. (Schnadig), a furniture manufacturing and distribution business, came into contact with Robert. Schnadig had adopted Schnadig Corporation Pension Plan #010 (Plan #010) in 1956, which was (before the events described herein) a qualified plan under section 401(a). Plan #010 was overfunded, with a net asset value of $24,598,003 and 103 active participants as of January 1, 2008.

The shareholders of Schnadig (including its president, who along with his wife and her family owned a majority interest) wanted to sell the company because its business was steadily shrinking. The shareholders also hoped to realize some value from the company's overfunded pension plan. Schnadig's officers accordingly made inquiries into a pension plan merger process they had heard about that might allow the shareholders to accomplish their goal. Those inquiries ultimately led them to Robert.

Effective December 31, 2007, Schnadig and its shareholders entered into a stock acquisition agreement with Liston Acquisitions, Inc. (Liston Acquisitions). Robert was the president of Liston Acquisitions, which had been incorporated in October 2007 for the purpose of acquiring Schnadig stock. William H. Campbell,[7] an attorney with the law firm Davis & Campbell, LLC (Davis & Campbell), drafted the stock acquisition agreement and served as counsel for Liston Acquisitions.

---

[7] Mr. Campbell first met Robert in the late 1980s. He regularly performed legal services for Robert in relation to corporate acquisitions.

[*7] However, the officers of Schnadig dealt exclusively with Robert with respect to the transaction.

Under the stock acquisition agreement, Liston Acquisitions was to pay Schnadig and its shareholders $12,900,000 in exchange for all outstanding shares of Schnadig stock. Before the transaction closed, Schnadig redeemed 30% of its outstanding shares in exchange for notes payable issued to certain of its shareholders. The notes issued in the redemption did not have face values; instead, they were designed to be repaid from the proceeds of an eventual sale of Schnadig's operating assets (i.e., Schnadig's assets other than Plan #010).

Liston Acquisitions completed its acquisition of the outstanding shares of Schnadig in January 2008. The required $12,900,000 payment was made on January 9, 2008, by wire transfer from Liston Acquisitions' account with a New York-based stock transfer agent, Continental Stock Transfer & Trust (Continental), to a limited liability company that the Schnadig shareholders had formed to facilitate receipt of the payment. Continental had received the funds several days earlier from an IOLTA (i.e., interest on lawyers' trust account) account held by Davis & Campbell (Davis & Campbell IOLTA Account).[8]

A year later, in January 2009, Schnadig sold its operating assets to a Chinese firm, Markor International Furniture Co., Ltd. The proceeds of that sale were paid to Schnadig's prior shareholders in satisfaction of the notes payable they had received in the redemption that preceded the stock sale.

During the period between the sale of its stock to Liston Acquisitions in 2008 and the sale of its operating assets to Markor International Furniture Co., Ltd., in 2009, Schnadig continued to manufacture and sell furniture under the direction of the same officers who had managed the company before the stock sale. Except for handling pension plan matters, for which Liston Acquisitions received a management fee, neither Robert nor Liston Acquisitions was involved in Schnadig's operations. Aside from the management fee, the former shareholders of Schnadig received any profits or cash generated by Schnadig.

---

[8] The total amount that Continental received from the Davis & Campbell IOLTA Account was $12,910,000.

**[\*8]** III.   *The fate of Plan #010*

In 2008, following the sale of Schnadig stock to Liston Acquisitions, Plan #010 did not receive any contributions or make any distributions to participants.  Moreover, its net asset value declined from $24,598,003 to $137,387.  These changes resulted from a series of transactions that Robert orchestrated upon taking control of Plan #010.

A.   *Transfers out of Plan #010*

On January 9, 2008—the same day that Liston Acquisitions completed its acquisition of Schnadig stock—Robert became a trustee of Plan #010,[9] and funds began to move out of Plan #010 into various accounts at Continental.  The first such transfer was a deposit of $17,600,000 into a Continental account for Plan #010 with an account number ending in 1500 (Plan #010 Account).

Additionally, on January 11, 2008, Plan #010 transferred $7,012,616 to Schnadig Retirement Pension Plan #001 (Participant Plan).  The Participant Plan had been established that same day by a new subsidiary of Schnadig named Schnadig Retirement Plan Services, Inc., and all Schnadig employees who had been participants in Plan #010 were immediately transferred to the Participant Plan.  The funds that Plan #010 transferred to the Participant Plan were sufficient to fully fund the benefits owed to the participants.

Several days later, acting on instructions from Robert, Continental made three transfers out of the Plan #010 Account.  First, Continental transferred $6,900,823.51 into an account for Schnadig, Inc. Pension Plan #001, with an account number ending in 1573 (Continental Account 1573).  Second, Continental transferred $7,100,851.73 into an account for Schnadig I, Ltd. Pension Plan #001, with an account number ending in 1581 (Continental Account 1581).  And third, Continental transferred $3,448,434.56 to an account for Schnadig II, Ltd. Pension Plan #001, with an account number ending in 1602 (Continental Account 1602).

The record does not include copies of any governing documents establishing Schnadig, Inc. Pension Plan #001, Schnadig I, Ltd. Pension Plan #001, Schnadig II, Ltd. Pension Plan #001, or any trust that may

---

[9] The president of Schnadig was also a trustee of Plan #010 until January 11, 2008.

[*9] have been a part thereof.[10]  However, the record does include written escrow agreements and account information sheets representing that Robert was the trustee of each of those plans[11] and establishing that Continental, as escrow agent, was to make wire transfers of pension plan assets in its possession in accordance with Robert's instructions.

### B.    *Federal reporting of the transfers*

The initial transfers of assets from Plan #010 to the Participant Plan, Schnadig, Inc. Pension Plan #001, Schnadig I, Ltd. Pension Plan #001, and Schnadig II, Ltd. Pension Plan #001 were reported to the Internal Revenue Service (IRS) and the U.S. Department of Labor[12] on Form 5500, Annual Return/Report of Employee Benefit Plan, for Plan #010's plan year ended December 31, 2008.  The Form 5500 reported that Beauxford Co., LLC (Beauxford), had replaced Schnadig as the sponsor of Plan #010.

Robert was closely connected with the members of Beauxford, among whom were his accountant, Kenneth L. Little, and his brother, James Smiley (James).[13]  Shane C. Barker, a business associate of Robert's, was an officer of Beauxford.[14]

Forms 5500 were also filed for Schnadig, Inc. Pension Plan #001, Schnadig I, Ltd. Pension Plan #001, and Schnadig II, Ltd. Pension

---

[10] For simplicity, we omit the words "and Trust" (and abbreviations thereof) that appear as part of the names of these plans in certain documents in the record.

[11] The text of the agreement relating to Schnadig, Inc. Pension Plan is not in the record, but the record does include a copy of an escrow agreement relating to Plan #010 that is substantially similar to the escrow agreements for Schnadig I, Ltd. Pension Plan and Schnadig II, Ltd. Pension Plan.  Each of the escrow agreements includes multiple references to an "Information Sheet."  Attached to the Plan #010 agreement are copies of documents titled "Escrow Agreement Information Sheet" listing contact information and account numbers for both Plan #010 and Schnadig, Inc. Pension Plan.  We accordingly infer that Continental acted as escrow agent for Schnadig, Inc. Pension Plan on substantially similar terms as for the other plans, and that Robert was its trustee.

[12] Qualified plans are subject to the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. No. 93-406, 88 Stat. 829 (codified as amended in scattered sections of Titles 26 and 29 U.S.C.), under which the IRS and the Department of Labor share oversight responsibilities with respect to such plans.  *See Flahertys Arden Bowl, Inc. v. Commissioner*, 115 T.C. 269, 272 (2000), *aff'd per curiam*, 271 F.3d 763 (8th Cir. 2001); *Citrus Valley Ests., Inc. v. Commissioner*, 99 T.C. 379, 400 (1992), *aff'd in part, remanded in part*, 49 F.3d 1410 (9th Cir. 1995).

[13] James died in 2017.

[14] Mr. Barker died in 2021.

[*10] Plan #001. Each of those plans reported a short plan year spanning no more than a handful of days in January 2008, with each plan ending its plan year with no participants. Each plan also reported beginning its plan year with assets matching the amount that had been transferred from Plan #010 into the corresponding account at Continental—$6,900,824 for Schnadig, Inc. Pension Plan #001, $7,100,852 for Schnadig I, Ltd. Pension Plan #001, and $3,448,435 for Schnadig II, Ltd. Pension Plan #001—and ending its plan year with no assets after transferring them to, respectively, Schnadig Retirement Trust #002, Schnadig I Retirement Trust #002, and Schnadig II Retirement Trust #002.

None of the purported recipients of the assets—i.e., Schnadig Retirement Trust #002, Schnadig I Retirement Trust #002, and Schnadig II Retirement Trust #002—has ever filed a return or other document with the IRS. And although bank accounts bearing similar names (Schnadig Retirement Trust, Schnadig I Retirement Trust, and Schnadig II Retirement Trust) existed at Bank of America, the statements for those accounts do not reflect transactions consistent with the amounts of the transfers reported on the corresponding Forms 5500.

## IV. *Financing of the Schnadig stock acquisition*

The funds that Liston Acquisitions used to complete its acquisition of Schnadig stock (and thus Plan #010) were borrowed. The identities of the lenders and the details of the financing arrangements are purportedly set forth in a series of documents reflecting transactions among a constellation of entities connected to Robert. But the money that actually changed hands tells a different story.

### A. *The financing arrangements on paper*

The first set of documents purporting to establish the terms of the financing consists of three notes payable made by Liston Acquisitions for a total of $12,900,000, as follows:

| *Date* | *Payee* | *Principal* | *Interest*[15] | *Due* |
|---|---|---|---|---|
| Jan. 3, 2008 | Brasilia, Inc. | $4,900,000 | $246,870 | Feb. 1, 2008 |
| Jan. 3, 2008 | Manaus, Inc. | 4,100,000 | 206,570 | Feb. 1, 2008 |
| Jan. 3, 2008 | Sobral, Inc. | 3,900,000 | 196,560 | Feb. 1, 2008 |

---

[15] The notes provided for a fixed initial interest payment on the due date. To the extent that any principal and interest remained unpaid, the notes provided for

**[*11]** There is, however, no evidence that any of the payees in fact lent the stated principal amounts to Liston Acquisitions.

Next, the notes payable were purportedly guaranteed by Liston Partners, LLLP (Liston Partners), through a series of guaranties dated January 10, 2008, and signed by Robert as its managing partner. As of December 2007, Robert was the general partner of Liston Partners, and it had five limited partners: Deerco, Inc. (Deerco), of which Robert was the sole shareholder and sole officer during 2008 and 2009; the Robert W. Smiley, Jr. 2007 Irrevocable Trust (Smiley Trust),[16] of which Margaret was a trustee; James; Mr. Little; and Mr. Barker.

Liston Partners then purported to assign its rights, duties, and obligations under the guaranties to Deerco as of January 10, 2008. Robert signed documents accepting the assignments on Deerco's behalf.[17]

Deerco then, by two memoranda to Davis & Campbell dated January 21, 2008, purported first to acknowledge that Davis & Campbell was holding $13 million in the Davis & Campbell IOLTA Account on Deerco's behalf[18] and second to direct Davis & Campbell to disburse $12,900,000 from the Davis & Campbell IOLTA Account to Liston Acquisitions. There is, however, no evidence that Davis & Campbell acted on those instructions.[19]

---

interest to accrue at a rate of 4.5% per annum on the unpaid balance, which would be due 25 years from the dates of the notes.

[16] The Smiley Trust was established in December 2007 and was treated as a grantor trust, with Robert as the grantor, during 2008. Income and deductions attributable to a grantor trust pass through the trust and must be taken into account by the grantor for federal income tax purposes. *See Taproot Admin. Servs., Inc. v. Commissioner*, 133 T.C. 202, 212 (2009), *aff'd*, 679 F.3d 1109 (9th Cir. 2012). The beneficiaries of the Smiley Trust were Robert, his spouse, and his spouse's descendants.

[17] Deerco ultimately took the position that its acceptance of the assignments increased its basis in Liston Partners by $12,900,000, and that its partnership interest was then redeemed in exchange for stock in Liston, Inc. (an entity distinct from Liston Acquisitions). The merits of that position are immaterial to the resolution of the issues that remain before us.

[18] According to the memorandum, the $13 million represented proceeds from the sale of Liston, Inc. *See supra* note 17.

[19] The January 2008 statement for the Davis & Campbell IOLTA Account reflects a wire transfer on January 24 to "Liston Acquisi[tions]," but that transfer was of only $750,000.

[*12]  By three further memoranda also dated January 21, 2008, Liston Acquisitions purported to direct Davis & Campbell to pay each of the purported lenders (i.e., Brasilia, Inc., Manaus, Inc., and Sobral, Inc.), out of funds in the Davis & Campbell IOLTA Account, the exact principal amount set forth in each of the notes payable that it had made in their favor.  There is, however, no evidence that Davis & Campbell in fact made the payments as directed.[20]

Finally, in an unsigned promissory note dated January 25, 2008, Liston Acquisitions purportedly promised to repay a $13,550,000 loan from Deerco on terms stated in the note.

B.  *The financing arrangements in reality*

In reality, $12,800,000 of the $12,900,000 that Liston Acquisitions used to complete its purchase of Schnadig stock is traceable to loans made by third-party lenders to a different entity, Medford, Inc. (Medford), that Robert controlled and indirectly owned through a trust. Medford itself provided the remaining $100,000.[21]

The lenders supplied the funds on January 2 and 3, 2008, through wire transfers to the Davis & Campbell IOLTA Account, as follows: $10 million from General Yellow Pages Consultants, Inc. (General Yellow); $1 million from Guy L. Vitale, Jr.;[22] $1 million from Hunzeker Leasing Corp.; and $800,000 from Dennis Long.

Each of the transfers corresponds to a note payable made by Medford.  The note relating to the transfer from General Yellow was made to one of its owners, Christopher F. Cummings.  That note provided for interest at 2% (or another agreed rate) and repayment of the principal and accrued interest "within a reasonable time after the closing of the transaction with respect to which the loan relates."  It did

---

[20] The January 2008 statement for the Davis & Campbell IOLTA Account does reflect wire transfers on January 25 to "Brasilia, Inc[.]," "Manaus, Inc[.]," and "Sobra[l], Inc."  However, each of those transfers was of less than $30,000.

[21] Medford's portion of the funds was drawn from $126,000 that it transferred into the Davis & Campbell IOLTA Account on January 2, 2008.  To resolve the issues before us, we need not decide how Medford's $100,000, or the $12,800,000 it borrowed, should be characterized as between Medford and Liston Acquisitions (i.e., whether some or all of the funds may have been a loan or capital contribution).

[22] Part of the money came directly from Mr. Vitale and the rest was transferred from Dain Rauscher LLLP.  The parties agree that transfers from and to Dain Rauscher LLLP and Citigroup that appear in the January 2008 statement for the Davis & Campbell IOLTA Account in fact reflect transfers from and to Mr. Vitale.

**[*13]** not state a principal amount or specify the related transaction. The note relating to the transfer from Mr. Vitale was made to G & M Distributors, Inc. (which, the parties agree, acted on Mr. Vitale's behalf), in the amount of $1 million, plus interest of $35,000 (i.e., 3.5% of the principal). It provided that repayment was due on or before February 3, 2008. The notes relating to the remaining two transfers were similar. One was made to Hunzeker Leasing Corp. for $1 million plus interest of $35,000 (equal to 3.5% of the principal); the other was made to Mr. Long for $800,000 plus interest of $28,000 (again equal to 3.5% of the principal).

Robert purported to sign each of the notes payable as either the secretary or president of Medford, even though his business associate, Mr. Barker, was the sole officer of Medford as of the dates of the notes.[23]

V.    *Repayment of the loans and transfers to the Smiley Trust*

Unlike the entities that purportedly made loans to Liston Acquisitions, Medford's creditors were all in fact repaid. The repayments were accomplished using funds that Robert had transferred out of Plan #010, which were conveyed to the creditors through the Davis & Campbell IOLTA Account. In conjunction with the loan repayments, funds from Plan #010 also flowed through the Davis & Campbell IOLTA Account to the Smiley Trust. In total, the repayments to the creditors, the payments to the Smiley Trust, and fees paid to Continental for facilitating the transactions absorbed $17,448,000 of funds traceable to Plan #010.

    A.    *First set of loan repayments and first transfer to the Smiley Trust*

The process of repaying the loans commenced on January 17, 2008, with two wire transfers to the Davis & Campbell IOLTA Account consisting of funds traceable to Plan #010: $6,900,000 from Continental Account 1573 and $7,100,000 from Continental Account 1581. Robert's attorney, Mr. Campbell, handled all wire transfers involving the Davis & Campbell IOLTA Account and moved Plan #010 funds to and from that account only with instructions from Robert.

---

[23] Mr. Barker resigned as an officer of Medford in May 2011, and Robert thereafter became its chief executive officer, president, secretary, and treasurer. Medford was administratively dissolved in August 2017.

[*14] Before the transfers from Continental Accounts 1573 and 1581, the only money in the Davis & Campbell IOLTA Account (excluding a nominal unrelated balance carried forward from the previous month) was $16,000 that Medford had deposited immediately before the Schnadig stock acquisition.[24] The result of the two transfers from Continental Accounts 1573 and 1581 was thus that the Davis & Campbell IOLTA Account held $14 million of funds traceable to Plan #010 and $16,000 of non-Plan #010 funds.[25]

On January 22, the following total payments were made by wire transfer from the Davis & Campbell IOLTA Account to three of the four lenders: (1) $1,035,000 to Mr. Vitale;[26] (2) $1,035,000 to Hunzeker Leasing Corp.; and (3) $828,000 to Mr. Long.[27] The amounts of those payments correspond to the total principal and interest set forth on the faces of the notes payable that Medford made to each lender.

Through an additional wire transfer on January 22, $516,395.47 was returned to Continental.[28]

The next day, a payment of $1,775,000 was made by wire transfer to the Smiley Trust.[29] A $6 million payment[30] was also made by wire

---

[24] This amount was left over from $126,000 that Medford supplied for the financing of the Schnadig stock acquisition, $110,000 of which was transferred to Continental with the $12,800,000 supplied by the lenders. *See supra* notes 8, 21.

[25] Although Medford made one additional deposit into the Davis & Campbell IOLTA Account on January 17, that deposit does not affect our analysis because an identical amount was transferred out to Continental the next day. No other deposits or transfers were made to or from the Davis & Campbell IOLTA Account from January 18–21.

[26] *See supra* note 22.

[27] The parties have stipulated that the payments to Mr. Vitale, Hunzeker Leasing Corp., and Mr. Long are traceable to funds from Schnadig I, Ltd. Pension Plan #001, i.e., the $7,100,000 transferred to the Davis & Campbell IOLTA Account from Continental Account 1581. The parties have further stipulated that none of those lenders was a participant in Schnadig I, Ltd. Pension Plan #001.

[28] The parties have stipulated that this payment is traceable to funds from Schnadig I, Ltd. Pension Plan #001 and that Continental was not a participant in Schnadig I, Ltd. Pension Plan #001.

[29] The parties have stipulated that this payment is traceable to funds from Schnadig I, Ltd. Pension Plan #001 and that the Smiley Trust was not a participant in Schnadig I, Ltd. Pension Plan #001.

[30] Because there were not sufficient funds in the Davis & Campbell IOLTA Account from other sources, this payment is traceable to the $6,900,000 transferred from Continental Account 1573, i.e., Schnadig, Inc. Pension Plan #001. The parties

[*15] transfer to the fourth lender, General Yellow, leaving $4 million of the original loan principal outstanding.

Following these transfers, the balance of the Davis & Campbell IOLTA Account consisted of $2,810,604.53 of funds traceable to Plan #010 and $16,000 of non-Plan #010 funds.

B.    *Additional deposits to the Davis & Campbell IOLTA Account and second transfer to the Smiley Trust*

On January 24, funds were deposited in the Davis & Campbell IOLTA Account from two additional sources: (1) a check from Hoiler, Inc. (Hoiler), for $1,775,000, which bore Mr. Barker's signature and a Bank of America account number ending in 8045 but gave no other indication of the source of the funds, and (2) a wire transfer of $3,448,000 from Continental Account 1602.

With the funds from Hoiler, the Davis & Campbell IOLTA Account held $1,791,000 of non-Plan #010 funds.[31]   These funds were mostly absorbed by $1,235,000 of transfers to various entities on January 24, leaving $556,000 of non-Plan #010 funds still unused.

The funds from Continental Account 1602 were almost entirely absorbed by a wire transfer of $3,373,000 made to the Smiley Trust on the next day, January 25.   The Smiley Trust immediately returned $1,775,000 of that money by check with the notation "repay [M]edford loan."[32]   At that point, the Davis & Campbell IOLTA Account held $4,660,604.53 of funds traceable to Plan #010.

The remaining non-Plan #010 funds were sufficient to cover several transfers on January 25 to Medford, Brasilia, Inc., Manaus, Inc., and Sobral, Inc., totaling $227,000, leaving $329,000 of non-Plan #010 funds still unused.  A group of transfers totaling $1,140,000 that were made to Beauxford, also on January 25, were sufficient to absorb the rest of the non-Plan #010 funds and $811,000 of the funds traceable to

---

have stipulated that General Yellow was not a participant in, or investment of, Schnadig, Inc. Pension Plan #001.

[31] We assume for purposes of our analysis that the funds from Hoiler cannot be traced definitively to Plan #010.  For the reasons indicated *infra* note 37, however, one could readily infer that Hoiler merely redeposited Plan #010 funds into the Davis & Campbell IOLTA Account.

[32] On January 25 there were not sufficient funds in the Smiley Trust's checking account from any other source to cover the payment.

[*16] Plan #010.  Thereafter, the entire balance available in the Davis & Campbell IOLTA Account consisted of $3,849,604.53 from Plan #010.

On January 29, the $516,395.47 that had previously been returned to Continental was wired back into the Davis & Campbell IOLTA Account.  This transfer lifted the available balance to $4,366,000, all of which was traceable to Plan #010.[33]  Four $4,000 payments to Continental, each made by check,[34] reduced the balance to $4,350,000.

### C.  *Final loan repayment*

The amount left in the Davis & Campbell IOLTA Account was exactly enough to pay off the remaining principal and interest on the loan from General Yellow.  The repayment was completed with a wire transfer of $4 million to General Yellow on February 5, 2008, which was accompanied by an interest payment of $350,000 that was made by wire transfer to Mr. Cummings.[35]

## VI.  *Endearco transactions*

Robert employed the funds from Plan #010 that were transferred to the Smiley Trust in a sequence of transactions and related income tax reporting involving Endearco, Inc. (Endearco).  Robert was the sole officer of Endearco during 2008.

On January 23, 2008, immediately after receiving $1,775,000 from the Davis & Campbell IOLTA Account, the Smiley Trust transferred that money from its Bank of America checking account to Endearco's Bank of America checking account, which had an account

---

[33] On January 29 the Davis & Campbell IOLTA Account received another transfer of $388,000 from Continental, but that amount was immediately transferred to Medford and does not affect our analysis.

[34] A $4,000 fee was due to Continental under each of the escrow agreements described *supra* Part III.A.

[35] As we have described, Mr. Cummings was an owner of General Yellow and had received a note payable from Medford for an unspecified principal amount plus interest at a rate of either 2% or another agreed rate.  The payment to Mr. Cummings represented 3.5% of the total loan principal, matching the rate paid to the other lenders.

[*17] number ending in 9912.[36]  The transaction was identified on the Smiley Trust's account statement as "NV Tlr transfer to Chk 9912."[37]

Next, the Smiley Trust entered into a stock redemption agreement with Endearco dated January 25, 2008.  In the agreement, the Smiley Trust represented that it owned all of Endearco's common and preferred stock and that it wished to sell the preferred stock back to Endearco at a price of $10.  Robert signed the agreement on Endearco's behalf, and Margaret signed it on behalf of the Smiley Trust.  In addition, Robert signed a document authorizing the transfer to Endearco, for $10, of 1,775,000 shares of Endearco preferred stock that were carried in Robert's name on Endearco's books.

On Schedule D, Capital Gains and Losses, of its 2008 Form 1041, U.S. Income Tax Return for Estates and Trusts, the Smiley Trust reported items of capital gain and loss from two separate transactions involving Endearco stock.  One of the items was a short-term capital loss from property identified as "Endearco, Inc. class p," i.e., Endearco preferred stock.  As reported on the Schedule D, the preferred stock was acquired and sold on "[v]arious" dates, had a basis of $1,775,000, and was sold for $10, resulting in a loss of $1,774,990.  The other item was a long-term capital gain from property identified as "Endearco, Inc.," i.e., Endearco common stock.  As reported on the Schedule D, the common stock was acquired and sold on "[v]arious" dates, had a basis of $6,000, and was sold for $3,373,000, resulting in a gain of $3,367,000.

VII.  *Deposits to Robert's bank account*

From May through October 2008 Robert made deposits totaling $5,130,000 into his personal Bank of America checking account.  The deposits comprising that sum were all identified as "NV Tlr transfer" on the account statements.

---

[36] The Smiley Trust's Bank of America checking account, from which the transfer was made, did not have sufficient funds from any other source to cover the payment.

[37] Endearco thereafter transferred the $1,775,000 to a checking account with an account number ending in 8045, as indicated by a January 24, 2008, entry on its account statement labeled "NV Tlr Transfer to Chk 8045."  Also on January 24, 2008, as we described *supra* Part V.B, Hoiler deposited $1,775,000 into the Davis & Campbell IOLTA Account by check drawn on a Bank of America account with an account number likewise ending in 8045.

[*18] VIII. *Checks drawn on BCH's checking account*

Petitioners submitted to respondent copies of more than 100 checks drawn on BCH's Bank of America checking account. Robert's signature appears on each of the checks, most of which bear dates in early 2009. Among the payees of the checks were Thomson Reuters, the ESOP Association, law firms, credit card accounts, insurance companies, Overton Urgent Care, Inc., Randall Jensen, O.D., Ace Hardware, Overton Auto Parts, and Days Remembered Flower Shoppe.

IX. *Petitioners' federal income tax returns*

A. *Robert*

Robert timely filed his federal income tax return for the 2008 taxable year, electing married filing separately as his filing status. He reported adjusted gross income of $136,209, which did not include any of the $17,448,000 that he had transferred out of Plan #010 or the $5,130,000 of deposits made to his Bank of America account during that year. Robert further claimed a capital loss of $1,500 as the deductible portion of an overall capital loss of $308,715, as calculated on Schedule D, Capital Gains and Losses, included with the return. Among the components of the capital loss calculation were a short-term loss of $1,774,990 and a long-term gain of $3,367,000, both of which were reported on lines indicating that the items were passed through from the Smiley Trust. The total tax due shown on the return was $473.

Robert also filed federal income tax returns for his taxable years 2009 and 2010. The 2009 return was timely filed, but the 2010 return was not. Respondent received Robert's 2010 return in July 2014.

For each year, Robert elected married filing separately as his filing status and reported that his tax due was zero. Among the income items included on those returns was $1 of wages from BCH, as shown on Form W–2, Wage and Tax Statement, attached to the 2009 return.

B. *Margaret*

Margaret filed federal income tax returns for her taxable years 2009 and 2010, both of which Robert prepared. The 2009 return was timely filed, but the 2010 return was not. Respondent received Margaret's 2010 return in July 2014.

[*19] Margaret elected married filing separately as her filing status for each year. For 2009 Margaret reported a total tax due of $368. For 2010 she reported a total tax due of $853.

### C. *BCH*

BCH filed a federal income tax return, Form 1120, U.S. Corporation Income Tax Return, for its taxable year 2009. On Schedule K, Other Information, included in that return, BCH described its business activity as "Credit Intermediatio[n]" and its product or service as "Funding." The return bears Robert's signature as the secretary of BCH.

BCH did not file a federal income tax return for its taxable year 2010. Respondent consequently prepared a substitute for return for BCH for that year.

## X. *Respondent's examinations*

The path to respondent's discovery of Robert's scheme relating to Plan #010 began with a routine examination of Deerco's federal income tax return for its taxable year ended November 30, 2009 (TYE 2009). The issues identified throughout that examination eventually led respondent to open examinations of other income tax returns filed by Robert, Margaret, and several of the business entities connected with Robert. Eventually, respondent also opened examinations relating to the Forms 5500 reporting the asset transfers originating from Plan #010.

### A. *Income tax examinations*

The income tax examinations were assigned to a revenue agent (RA) in the IRS Large Business & International Division (LB&I).

1. *Mr. Little's representation of petitioners and Margaret's agreement to extend the assessment limitations period for 2009*

Over the course of the examinations, Deerco, Medford, BCH, Robert, and Margaret each executed Forms 2848, Power of Attorney and Declaration of Representative, appointing Robert's accountant, Mr. Little, to represent them in the examinations.

**[\*20]** Margaret's signature on the Form 2848 appointing Mr. Little as her representative was dated January 30, 2012. The Form 2848 included (1) Margaret's name, identification number, and mailing address; (2) the name of her representative, who was identified as "Kenneth L. Little, CPA," along with his address, and (3) a statement of Mr. Little's authority to represent Margaret in connection with Form 1040, U.S. Individual Income Tax Return, federal income tax matters for her taxable years 2009–12.

In June 2013 Mr. Little signed Form 872, Consent to Extend the Time to Assess Tax, on Margaret's behalf. Margaret and respondent agreed therein that the period of limitations on assessment of income tax for Margaret's taxable year 2009 would be extended until December 31, 2014.[38]

## 2. *The Deerco examination and its expansion*

After the initial task of examining Deerco's return for TYE 2009 was assigned to the RA, she contacted Robert to advise him of the opening of the examination. She thereafter set at least three interview appointments with Robert, but he canceled each of them at the last minute. Her attempts to conduct the interview on a voluntary basis having proved unsuccessful, the RA issued a summons to compel Robert to appear for an interview and to produce Deerco's books and records.

Although Robert partially complied with the summons by appearing for an interview, he did not produce the summoned books and records. Robert told the RA that he did not know where the books and records were. Additionally, he did not explain the nature of Deerco's

---

[38] When the RA mailed the Form 872 to Mr. Little for signature, she believed that he had been properly appointed as Margaret's representative pursuant to the Form 2848 that Margaret had signed in January 2012. But after receiving the executed Form 872, the RA noticed that Mr. Little had incorrectly indicated on the Form 2848 that he was an enrolled agent, rather than a certified public accountant. In view of Mr. Little's error, the RA was concerned that the Form 2848 may not have been effective to appoint Mr. Little as Margaret's representative as of January 2012.

The RA consequently obtained a replacement Form 2848 from Mr. Little. But because the replacement Form 2848 bore a date later than the date of Mr. Little's signature on the Form 872, the RA concluded that it did not establish his authority to sign the Form 872 on the date he did so. She therefore requested that Mr. Little provide another replacement Form 2848 or a replacement Form 872 to rectify the date discrepancy. The record does not establish whether he complied with that request.

[*21] business to the RA, and she never developed a good understanding of its business during the examination.

As the examination unfolded, the RA identified what she described as a "large, unusual, and . . . questionable" item, implicating roughly $13 million in assets, that related to Deerco's TYE 2009 as well as its preceding taxable year, ended November 30, 2008 (TYE 2008). She consequently expanded the examination to include Deerco's federal income tax return for TYE 2008 and issued an Information Document Request (IDR) seeking further information about the item she had identified. The RA thereafter discovered that certain expenses Deerco had reported on its return for TYE 2008 may have been paid through the Davis & Campbell IOLTA Account, so she also requested copies of the bank statements for that account.

Robert neither produced statements for the Davis & Campbell IOLTA Account nor directed Davis & Campell to do so. The RA eventually obtained the account statements after issuing a summons, which Davis & Campbell unsuccessfully sought to quash on grounds of attorney-client privilege, directly to Davis & Campbell's bank.

In response to the IDR, Robert did produce (through his representative, Mr. Little) the documents described *supra* Part IV.A detailing the purported loan transactions involving Deerco, Brasilia, Inc., Manaus, Inc., and Sobral, Inc. But when the RA asked Robert to explain the source of the $13 million that those documents purported to show was paid to Deerco, as well as the $12,900,000 that the documents purported to show was paid to Liston Acquisitions, he responded that he could not remember where the funds had originated. Nor could the RA herself identify the sources of those funds from examining the Davis & Campbell IOLTA Account statements.

Unconvinced that the documents she had received adequately substantiated Deerco's income tax reporting, the RA expanded her examination further. As a result, she discovered that Liston Acquisitions had reported expenses that she did not believe were adequately explained. And upon inspecting Robert's individual income tax return for 2008, she became skeptical of both his reporting of certain capital losses and his reporting of minimal wage income—a total of eight dollars from eight separate Forms W–2 issued by his business entities— that she believed was insufficient to support his lifestyle.

[*22] The RA then requested Robert's own bank statements. When Robert responded by providing only one bank statement that revealed limited information, the RA issued a summons to Bank of America for additional statements. The statements that Bank of America produced in response revealed several large deposits, which the RA asked Robert to explain. Robert claimed that the deposits represented the proceeds of a loan he had taken from Medford. To substantiate that claim, he produced a promissory note dated May 15, 2008, wherein he promised to pay Medford "the sum of up to $6,000,000.00," in amounts drawn at Robert's option, plus "interest from the date of each withdrawal on the unpaid principal at the rate equal to the applicable federal rate in effect at the time of such withdrawal." The note provided for a lump sum interest-only payment on December 16, 2020, with full repayment of the principal and accrued interest due by December 16, 2025. The RA was not persuaded that the terms of the note were consistent with a bona fide loan.

When the RA asked Robert to explain how he was able to live on the eight dollars of wages that he reported for 2008, he responded that he lived on loans from his entities.

At that point the RA again expanded her examination, turning her focus to Medford. To commence the Medford examination, she contacted Robert's business associate, Mr. Barker, whom she had identified as an officer of Medford. Mr. Barker informed the RA that he had resigned as an officer of Medford and was replaced by Robert. The RA nonetheless proceeded to interview Mr. Barker in his capacity as a third party. She learned from that interview that although Mr. Barker had signed Medford's tax returns, he did not understand anything about Medford's business or the items Medford reported on its returns. He explained that he had trusted Robert, who was actually responsible for managing Medford.

The examination ultimately expanded to include Margaret's income tax returns as well. In an interview, Margaret was unable to explain the reporting of items on her returns. She told the RA that Robert was responsible for handling business transactions and preparing her returns, and that she trusted him.

B.    *Pension plan examinations*

LB&I eventually referred issues relating to Plan #010 to the Employee Plans subdivision of the IRS's Tax Exempt & Government

[*23] Entities Division. An Employee Plans Examiner was assigned to examine transactions reported on the Forms 5500, described *supra* Part III.B, detailing the disposition of Plan #010's assets.

The Employee Plans Examiner began her examination by requesting documents from Beauxford, which had (as we have noted) replaced Schnadig as the sponsor of Plan #010. When Beauxford failed to produce the requested documents, the Employee Plans Examiner issued summonses to Beauxford and related individuals, including James and Mr. Barker, as well as several financial institutions. Among the documents she obtained through those summonses were statements for the relevant accounts at Continental and Bank of America, along with statements for the Davis & Campbell IOLTA Account. The summoned account statements enabled the Employee Plans Examiner to trace the flow of funds from Plan #010 into the Davis & Campbell IOLTA Account.

As a result of her examination, the Employee Plans Examiner concluded that Robert had unreported income of $17,448,000 from the amounts he had extracted from Plan #010. She further concluded that Plan #010, Schnadig, Inc. Pension Plan #001, Schnadig I, Ltd. Pension Plan #001, and Schnadig II, Ltd. Pension Plan #001 were not qualified plans under section 401(a) for their plan years ended in 2008.

## XI. *Notices of deficiency and Tax Court proceedings*

At the conclusion of the income tax examinations, respondent issued the notices of deficiency upon which these cases are based to Robert, Margaret, and BCH.[39]

### A. *Robert*

Among the adjustments that respondent made in the notice of deficiency for Robert's taxable year 2008 was the disallowance of Robert's claimed loss from the Endearco preferred stock for lack of substantiation. Respondent also determined that Robert failed to report income of $5,130,000.

Robert timely filed a Petition for redetermination for 2008. Respondent's counsel, David Weiner, thereafter sought and obtained the

---

[39] Respondent also issued notices of deficiency to Deerco and Medford. As we indicated *supra* note 1, the parties have resolved the cases based on those notices of deficiency that were formerly consolidated herewith.

[*24] Court's leave to file an Amendment to Answer asserting an increased deficiency and a section 6663(a) fraud penalty against Robert. Mr. Weiner's immediate supervisor gave written approval of the assertion of the fraud penalty before respondent moved for leave to file the Amendment to Answer.

In the notice of deficiency for Robert's taxable years 2009 and 2010, respondent determined, among other things, that Robert received and failed to report compensation income of $907,024 for 2009. Robert timely filed a Petition for redetermination for 2009 and 2010.

Before the mailing of either notice of deficiency, the RA's immediate supervisor at the time signed a document indicating that he approved the determination of accuracy-related penalties for all of Robert's taxable years at issue.

B.  *Margaret*

In the notice of deficiency for Margaret's taxable years 2009 and 2010, respondent determined, among other things, that Margaret received and failed to report a dividend of $907,024 for 2009. Before the mailing of the notice of deficiency, the RA's immediate supervisor at the time approved the determination of accuracy-related penalties for 2009 and 2010 by signing Form 5701, Notice of Proposed Adjustment, which incorporated by reference Form 886–A, Explanation of Items, setting forth the reasons for the RA's penalty determinations. Margaret timely filed a Petition for redetermination.

On the eve of trial, Margaret sought and obtained the Court's leave to file an Amendment to Petition. Therein, she alleged that section 6501 bars respondent from assessing income tax for her 2009 taxable year because the limitations period expired on October 15, 2013, before the mailing of the notice of deficiency. She denied the existence of any Form 872 that would have extended the limitations period beyond October 2013,[40] though she admitted that she signed a Form 872 in August 2014 that would have extended the limitations period beyond the mailing date of the notice of deficiency.

---

[40] At trial, respondent produced the Form 872 described *supra* Part X.A.1, extending the limitations period until December 31, 2014, which Mr. Little had signed on Margaret's behalf in June 2013. Respondent previously had been unable to find that document.

**[\*25]** C.  *BCH*

In the notice of deficiency for BCH's taxable years 2009 and 2010, respondent determined, among other things, to disallow a number of categories of BCH's claimed expense deductions for 2009.  Respondent further determined that BCH is liable for a negligence penalty for 2009 and additions to tax for 2010.  BCH timely filed a Petition for redetermination.  As we have noted, however, BCH now fully concedes respondent's determinations except to the extent that (1) our determination as to the whipsaw issue concerning Robert and Margaret may entitle BCH to a deduction for 2009 and (2) respondent concedes an adjustment to BCH's income for 2010.  *See supra* notes 3 and 4.

OPINION

I.  *Deficiency determinations*

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous.  *See* Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933).  This presumption of correctness applies where the Commissioner has determined that a taxpayer had unreported income so long as the Commissioner introduces some substantive evidence that the taxpayer received the unreported income.  *Hardy v. Commissioner*, 181 F.3d 1002, 1004 (9th Cir. 1999), *aff'g* T.C. Memo. 1997-97; *Rapp v. Commissioner*, 774 F.2d 932, 935 (9th Cir. 1985).[41]  The requisite evidentiary foundation is "minimal."  *Banister v. Commissioner*, T.C. Memo. 2008-201, 96 T.C.M. (CCH) 114, 114, *aff'd*, 418 F. App'x 637 (9th Cir. 2011).  Moreover, the taxpayer bears the burden of proving entitlement to any deduction or credit claimed.  *Segel v. Commissioner*, 89 T.C. 816, 842 (1987).

Under section 7491(a), the burden of proof may shift in certain circumstances from the taxpayer to the Commissioner.  Petitioners do not contend, however, that section 7491(a) shifts the burden of proof

---

[41] Robert and Margaret both resided in Nevada when they filed their Petitions, so any appeal in their cases would lie to the U.S. Court of Appeals for the Ninth Circuit unless the parties were to stipulate otherwise.  *See* § 7482(b).  We thus apply the precedent of that court, to the extent it is directly on point, to resolve issues concerning the deficiencies and penalties determined (or asserted) against Robert and Margaret.  *See Golsen v. Commissioner*, 54 T.C. 742, 756–57 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).  BCH's principal place of business was in Illinois when it filed its Petition, so any appeal in its case would ordinarily lie to the U.S. Court of Appeals for the Seventh Circuit.

**[\*26]** under the circumstances of these cases. *See Akey v. Commissioner*, T.C. Memo. 2015-227, at \*11 ("A taxpayer seeking to shift the burden of proof pursuant to section 7491(a)(1) has the burden of showing that he has satisfied the section 7491(a)(2) preconditions."). The Commissioner nevertheless bears the burden of proof as to any increased deficiency asserted in his Answer or an amendment thereto. *See* Rule 142(a)(1); *Roberts v. Commissioner*, 141 T.C. 569, 575 (2013).

### A.    *Margaret's statute of limitations defense*

Before turning to the merits of the disputed adjustments, we consider Margaret's affirmative defense that the section 6501 limitations period bars any assessment of income tax for her 2009 taxable year. She does not press this issue on brief,[42] and we deem it abandoned. *See Davis v. Commissioner*, 119 T.C. 1, 1 n.1 (2002).

Even if the issue were not abandoned, we would find that respondent mailed the notice of deficiency before the expiration of the limitations period. The Form 2848 that Margaret signed in January 2012 contained sufficient information to appoint Mr. Little as her representative under respondent's procedural rules. *See* Statement of Procedural Rules, 26 C.F.R. § 601.503(a); *see also Ryan v. Commissioner*, T.C. Memo. 1991-49, 61 T.C.M. (CCH) 1801, 1803–04 (explaining that the Commissioner's procedural rules relating to powers of attorney are for his own protection and convenience and do not have mandatory effect). Furthermore, even if the original Form 2848 had been defective, the fact that the RA obtained a replacement Form 2848 from Mr. Little would establish that Margaret ratified Mr. Little's prior execution of the Form 872. *See Ryan*, 61 T.C.M. (CCH) at 1804. The Form 872 was thus effective to extend the limitations period beyond its initial expiration date, and Margaret concedes that she consented to a further extension sufficient to establish the timeliness of the notice of deficiency. Her section 6501 defense consequently fails.

### B.    *Robert's unreported income and disallowed short-term capital loss for 2008*

For Robert's taxable year 2008, we must determine whether he (1) had unreported income of $17,448,000 from Plan #010, as respondent asserts in his Amendment to Answer, (2) had unreported income of

---

[42] Petitioners filed joint briefs in these cases. Where their briefs advance a position concerning an issue affecting a specific petitioner, we will refer to it as that petitioner's position.

[*27] $5,130,000 as respondent determined in the notice of deficiency, and (3) was entitled to deduct his claimed short-term capital loss of $1,774,990 that respondent disallowed in the notice of deficiency.

### 1. *Unreported income*

A taxpayer's gross income generally includes all income from whatever source derived. *See* § 61(a); *Charley v. Commissioner*, 91 F.3d 72, 73–74 (9th Cir. 1996), *aff'g in part, rev'g in part* T.C. Memo. 1993-558. "The starting point in all cases dealing with the question of the scope of what is included in 'gross income' begins with the basic premise that the purpose of Congress was 'to use the full measure of its taxing power.'" *James v. United States*, 366 U.S. 213, 218–19 (1961) (quoting *Helvering v. Clifford*, 309 U.S. 331, 334 (1940)). Section 61 accordingly includes in gross income "all gains except those specifically exempted." *James*, 366 U.S. at 219.

"A gain 'constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it.'" *Id.* (quoting *Rutkin v. United States*, 343 U.S. 130, 137 (1952)). This is true whether or not the recipient obtains title to the property giving rise to the gain. *Id.* at 216–17. Consequently,

> [w]hen a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent."

*Id.* at 219 (quoting *N. Am. Oil Consol. v. Burnet*, 286 U.S. 417, 424 (1932)).

By contrast, the proceeds of a bona fide loan are not includible in a taxpayer's gross income because the receipt of money is offset by a corresponding obligation to repay. *See Commissioner v. Tufts*, 461 U.S. 300, 307 (1983); *James*, 366 U.S. at 219.

### a. *Funds transferred out of Plan #010*

Respondent bears the burden of proving by a preponderance of the evidence that, as asserted in his Amendment to Answer, Robert received and failed to report as income $17,448,000 that he transferred

**[\*28]** out of Plan #010 after he became its trustee. Respondent has more than carried that burden.

As we have described, Plan #010 was a qualified plan when Robert became one of its trustees, and an essential feature of a qualified plan is a trust that complies with the requirements of section 401(a). The general standards governing the operation of qualified plans and the conduct of their fiduciaries are established by ERISA. *See Caton v. Commissioner*, T.C. Memo. 1995-80, 69 T.C.M. (CCH) 1937, 1947. Those standards require that "all assets of an employee benefit plan shall be held in trust by one or more trustees." 29 U.S.C. § 1103(a). The duties of a plan trustee flow from the common law of trusts, and the trustee "must hold legal title to the assets of an employee benefit plan with the intent to deal with these assets solely for the benefit of the members of that plan."[43] *Barboza v. Cal. Ass'n of Pro. Firefighters*, 799 F.3d 1257, 1265–66 (9th Cir. 2015).

In the specific context of a trustee who is alleged to have misappropriated trust funds, the "funds held in trust . . . become includible in his gross income once he has misappropriated them." *Bailey v. Commissioner*, T.C. Memo. 2012-96, 103 T.C.M. (CCH) 1499, 1515, *aff'd sub nom. Bailey v. IRS*, No. 13-1455, 2014 WL 1422580 (1st Cir. Mar. 14, 2014).

Whether a trustee has misappropriated funds held in trust is a question of fact. *Id.*; *see also FDIC v. Oldenburg*, 34 F.3d 1529, 1540 (10th Cir. 1994) (explaining that while the dishonest nature of embezzlement itself demonstrates an embezzler's intent, a factual question arises "where an individual's conduct falls somewhere between the two extremes of embezzlement and simple poor judgment"). Where the evidence establishes that a trustee has exerted his dominion and control over trust assets to appropriate them for his own use, the trustee realizes income at the time of the appropriation even if he does not expend the assets for his own purposes until a later taxable year. *See Bailey*, 103 T.C.M. (CCH) at 1516 & n.33.

The evidence that Robert transferred $17,448,000 out of Plan #010 for his own economic benefit, and not for the benefit of any plan participant, is clear and convincing. As we have described,

---

[43] More generally, any plan fiduciary must act "solely in the interest of the participants and beneficiaries" with the sole aim of "providing benefits to participants and their beneficiaries" and defraying plan administration expenses. 29 U.S.C. § 1104(a)(1).

**[\*29]** respondent has established through the relevant account statements that Robert, after taking control of Plan #010 as a trustee in early 2008, orchestrated a series of transfers of $17,448,000 of funds originally from Plan #010 that enabled him to repay debts owed by Medford (which he owned and controlled) and to augment the corpus of the Smiley Trust (of which he was treated as the grantor and also was a beneficiary, as were Margaret and her descendants). The debt repayment and transfers to the Smiley Trust were completed by early February 2008.

Robert maintained control over the entire $17,448,000 from the time he transferred that money out of Plan #010 until it was ultimately paid to the Smiley Trust and Medford's creditors. Although the funds were initially divided among accounts for Schnadig, Inc. Pension Plan #001, Schnadig I, Ltd. Pension Plan #001, and Schnadig II, Ltd. Pension Plan #001, all of those accounts, like the Plan #010 Account, were Continental escrow accounts subject to Robert's direction and control. Assuming arguendo that the funds were still held in trust after they were moved to those accounts, Robert remained the trustee. The money then moved from Continental to the Davis & Campbell IOLTA Account, which was under the control of Robert's long-time attorney, Mr. Campbell, who did not make transfers of Plan #010 funds to or from the account unless Robert instructed him to do so. There is no evidence that any of the transfers were made to benefit any participant in Plan #010 or any successor plan.

In view of those facts, we agree with respondent that Robert exercised his control over the assets of Plan #010, and any successor plan, to misappropriate the money for his own use. He therefore must include it in his gross income for 2008. This conclusion follows even though Robert ultimately directed some of the money to Medford's creditors (such that it may have constituted a loan or capital contribution from Robert to Medford, an issue that is not before us), and some to the Smiley Trust (such that his subsequent control of the money may have been limited and it ultimately may have been used for the enjoyment of trust beneficiaries other than Robert himself). *See Estate of Geiger v. Commissioner*, 352 F.2d 221, 231–32 (8th Cir. 1965) (holding embezzled funds includible in embezzler's income and finding "nothing persuasive in the fact that other persons were the recipients of the 'loans and gifts'" made from embezzled funds that never passed through the embezzler's own accounts), *aff'g* T.C. Memo. 1964-153; *Cruea v. Commissioner*, T.C. Memo. 1985-553, 50 T.C.M. (CCH) 1377, 1381 ("The fact that an embezzler directs embezzled funds to another person rather

**[\*30]** than using them for her own personal benefit does not prevent such funds from being gross income to the embezzler.").[44]

Arguing against this result, Robert raises a litany of unpersuasive arguments.

As a threshold matter, Robert contends that respondent should be barred from advancing any legal theory supporting the $17,448,000 income adjustment because he did not adequately disclose the legal basis for that adjustment in his Pretrial Memorandum or in response to a contention interrogatory propounded by petitioners. He further contends that respondent failed to disclose how the adjustment was calculated in his Pretrial Memorandum, in response to the contention interrogatory, or at trial.

We disagree. At a minimum, respondent's Pretrial Memorandum cited section 61 in relation to petitioners' alleged failure to report all their income, and further indicated that Robert's unreported income was "shown by bank statements and brokerage statements." Respondent's counsel also elicited testimony from the Employee Plans Examiner at trial relating to the calculation of the adjustment. Furthermore, as petitioners acknowledge, respondent's response to petitioners' contention interrogatory relied on section 61, along with U.S. Supreme Court decisions interpreting that provision, to explain why the $17,448,000 of Plan #010 funds should be included in Robert's gross income. Robert cannot have suffered any unfair prejudice or surprise from respondent's reliance on the same theory he disclosed before trial. *See Ware v. Commissioner*, 92 T.C. 1267 (1989), *supplementing* T.C. Memo. 1989-165, *aff'd*, 906 F.2d 62 (2d Cir. 1990). In any event, the Court is always free to apply the correct law to the facts before it. *See Dirico v. Commissioner*, 139 T.C. 396, 416–17 (2012).

With respect to the substance of respondent's position, Robert cites several authorities for the proposition that a taxpayer cannot have gross income, even after obtaining control over or misappropriating

---

[44] Insofar as one might argue that not all of the Plan #010 funds should be treated as Robert's income, since $811,000 of those funds can be traced to payments to Beauxford, and $1,775,000 of those funds was promptly returned from the Smiley Trust to the Davis & Campbell IOLTA Account, the same logic applies. To whatever extent Robert might have forgone personal use of any money absorbed by transfers to Beauxford in favor of bestowing a benefit on Beauxford's members (such as his brother, James), the money is still includible in his income. Most of the money was absorbed in repaying Medford's debt, benefiting Robert in the ways we have already described.

[*31] assets, unless the taxpayer personally receives a direct economic benefit from doing so. The authorities Robert relies on are readily distinguishable on the ground that they address scenarios where the taxpayer charged with receiving income controlled the funds in question merely as an agent or trustee on behalf of a third party. An illustrative example among the cases Robert cites is *Hobson v. Commissioner*, T.C. Memo. 1992-312, 63 T.C.M. (CCH) 3085, 3086, where we held that a bank employee did not receive income from bank funds that he manipulated in order to make unauthorized loans to bank customers, which the customers understood they were required to repay to the bank. But we also held that the employee *did* receive income to the extent he directed bank funds to his own brokerage account and to a corporation in which he was a shareholder. *See id.* We reached a similar conclusion here as to Robert's diversion of funds to the Smiley Trust and for Medford's benefit.

Robert also faults respondent's representatives for alleged inexperience, misunderstanding of the applicable law, and procedural or strategic defects in their examinations, including not interviewing an actuary who certified the Forms 5500 and not properly issuing "30-day letters" concerning the Employee Plans Examiner's plan disqualification determinations. These complaints ignore the long-settled rule that, absent exceptional circumstances not present here, we will not inquire into the sufficiency of the Commissioner's underlying examination procedures in a deficiency case. *See Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327–28 (1974); *Dynamo Holdings Ltd. P'ship v. Commissioner*, T.C. Memo. 2018-61, at *109–10.

Robert next contends that if anyone incurred a tax liability in connection with the amounts he transferred out of Plan #010, it must have been some taxpayer other than himself. He first points to Medford's creditors, suggesting offhand that they perhaps should be treated as distributees of a qualified plan under section 402(b)(2). But a distributee within the meaning of section 402 is normally a plan participant or the participant's beneficiary. *See Darby v. Commissioner*, 97 T.C. 51, 57–58 (1991). Robert has neither established that any of the creditors was a plan participant[45] nor explained why the usual meaning of "distributee" should not apply here.

---

[45] Indeed, he is to a great extent prevented from doing so by the parties' stipulations. *See supra* notes 27, 30.

**[\*32]** Alternatively, Robert suggests that the consequence of the disqualifications of Plan #010, Schnadig, Inc. Pension Plan #001, Schnadig I, Ltd. Pension Plan #001, and Schnadig II, Ltd. Pension Plan #001 is that the $17,448,000 at issue must be treated as one or more reversions taxable to the plan sponsors. In support of that contention, he cites the Employee Plans Examiner's testimony regarding her understanding of the consequences of plan disqualification, along with Revenue Ruling 2003-85, 2003-2 C.B. 291, which addresses the consequences of a voluntary termination of a qualified plan under specified conditions. Not only does the Employee Plans Examiner's understanding of the law carry no weight, as the Court made clear during her testimony, but the Revenue Ruling is also inapt. Contrary to Robert's unstated assumptions, plan disqualification does not inexorably result in termination, *see* John D. Colombo, *Paying for Sins of the Master: An Analysis of the Tax Effects of Pension Plan Disqualification and a Proposal for Reform*, 34 Ariz. L. Rev. 53, 68–74 (1992) (summarizing consequences of disqualification, including that trust remains in existence and becomes subject to tax), and termination does not inexorably result in reversion, *see Shepley v. New Coleman Holdings Inc.*, 174 F.3d 65, 69 (2d Cir. 1999) ("Although participants in a defined benefit plan lack any presumptive entitlement to surplus assets, employers also lack any such entitlement unless the plan [documents] provide[] for an employer distribution."). Robert offers no factual basis on which we could conclude that any reversion occurred in these circumstances.

Finally, Robert faults respondent for failing to disprove that the transactions involving funds from Plan #010 might have employed any lawful method that Robert may have known for "access[ing]" pension plan assets. Although Robert relies on testimony of Mr. Little and Mr. Campbell establishing that he knew of at least one such method, he cites no evidence that he actually put that knowledge into practice in the particular transactions before us here. In these circumstances, having proven a likely source of the income that he contends Robert failed to report, respondent has no obligation to disprove nebulous alternative explanations of the transactions at issue. *See Holland v. United States*, 348 U.S. 121, 138 (1954) ("[W]here relevant leads are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant."); *United States v. Anderson*, 642 F.2d 281, 285 (9th Cir. 1981) ("The [G]overnment must investigate and negate a taxpayer's explanation only if it is 'reasonable' and 'reasonably susceptible of being checked.'" (quoting *Holland*, 348 U.S. at 135–36)).

**[\*33]** Finding no merit in Robert's contentions, we hold that $17,443,000 is includible in his gross income for 2008.

b. *Deposits to Robert's bank account*

We turn next to respondent's determination in the notice of deficiency that Robert failed to report income of $5,130,000 from deposits into his Bank of America account. Robert does not deny that he received the amount at issue. Respondent thus bears no burden of production on that point, and Robert must prove by a preponderance of the evidence that respondent's determination is erroneous. To that end, Robert contends that the $5,130,000 was not includible in his gross income because it was a loan from Medford.

A bona fide loan exists when the parties to the transaction had an actual, good-faith intent to establish a debtor-creditor relationship at the time the funds were advanced. *Beaver v. Commissioner*, 55 T.C. 85, 91 (1970). The existence of such a relationship is a question of fact, which depends on whether the party advancing the funds intended to enforce repayment and whether the recipient intended to repay the amount advanced. *Berry Petroleum Co. & Subs. v. Commissioner*, 104 T.C. 584, 642 (1995), *aff'd*, 142 F.3d 442 (9th Cir. 1998) (unpublished table decision); *Beaver*, 55 T.C. at 91.

To evaluate whether a transaction is a bona fide loan we consider several objective factors, including (1) the existence of a promise to repay evidenced by a note or other instrument; (2) whether interest was charged; (3) the existence of a fixed schedule for repayment; (4) whether repayment was secured by any collateral; (5) whether the borrower made any repayments; (6) whether the borrower had a reasonable prospect of repaying the loan and the lender had sufficient funds to advance the loan; and (7) the parties' conduct. *See Welch v. Commissioner*, 204 F.3d 1228, 1230 (9th Cir. 2000), *aff'g* T.C. Memo. 1998-121. No single factor is dispositive. *See id.* "Loans between related parties, such as a shareholder and a closely held corporation, are subject to particular scrutiny 'because the control element suggests the opportunity to contrive a fictional debt.'" *Garavaglia v. Commissioner*, T.C. Memo. 2011-228, 102 T.C.M. (CCH) 286, 301 (quoting *United States v. Uneco, Inc. (In re Uneco, Inc.)*, 532 F.2d 1204, 1207 (8th Cir. 1976)), *aff'd*, 521 F. App'x 476 (6th Cir. 2013).

In Robert's view, the note he signed in favor of Medford is sufficient to establish that the $5,130,000 he received represents the

**[\*34]** proceeds of a bona fide loan. But Robert offers no analysis of the other objective factors bearing on the nature of the transaction, and he points to no other evidence supporting his position. Although the note sets out a promise to repay the principal, with interest, on a fixed schedule, Robert has not shown that the loan was secured by any collateral, that he made any repayments, that his and Medford's relative financial positions suggest the transaction reasonably could have been a loan, or that the parties otherwise conducted themselves as if the transaction were a loan.

Moreover, although Robert owned Medford only indirectly, his control over the corporation is illustrated by his purporting to sign documents as an officer of Medford at a time when he held no such post, as well as Mr. Barker's description of Robert's role as the true manager of Medford. Robert was later formally appointed as the sole officer of Medford well before the first payment would have been due under the note.

Against this backdrop, the lone factor supporting the conclusion that the transaction should be characterized as a loan is the promissory note itself, which Robert provided to the RA only after she summoned his bank records and questioned him about unexplained deposits that she discovered therein. None of this suggests that Robert ever truly intended to repay the money he received from Medford.[46] We thus conclude that he has failed to prove error in respondent's determination that he received and failed to report income of $5,130,000, and that determination is sustained.

### 2. *Endearco loss*

With respect to the disallowance of his claimed short-term capital loss from the Endearco preferred stock, Robert contends that respondent's determination impermissibly subjects him to tax on an illusory gain. At bottom, Robert's contention is that he should be permitted to offset the $1,775,000 that the Smiley Trust initially contributed to Endearco against the $3,373,000 that the Smiley Trust later realized on the sale of Endearco common stock representing, at the time of the sale, its entire interest in the corporation. Though he cites

---

[46] Respondent contends that we should infer from Robert's allowing Medford to be dissolved in 2017, before the first payment was due, that he never intended to repay the loan. We agree with Robert, however, that this fact is of limited probative value in view of Margaret's uncontroverted testimony that Robert was diagnosed with dementia around the same time that Medford was dissolved.

**[\*35]** no legal authority, he says this is so because he "could have structured the transaction as a single sale [of both preferred and common shares] or allocated [his] basis differently," and therefore he should be liable for tax only on "the overall correct result."[47]  For his part, respondent rests on the presumption of correctness, urging that Robert has failed to establish any basis in the preferred shares.

Under the circumstances before us here, we must abandon the notion that the complex rules ordinarily governing the taxation of corporations and their shareholders have any bearing on the federal income tax consequences of Robert's reported Endearco stock transactions.  We conclude that those transactions are shams, lacking in economic substance, which must be disregarded.

Whether particular transactions lack economic substance is a factual determination that requires us "to focus on the facts and circumstances . . . and resolve whether, as a practical matter, those transactions have any economic impact outside the creation of tax deductions." *Thompson v. Commissioner*, 631 F.2d 642, 646 (9th Cir. 1980), *aff'g* 66 T.C. 1024 (1976).  "Enmeshed as it is in factual considerations," our determination will "spring more from [our] experience 'with the mainsprings of human conduct' rather than the application of any legalistic formula." *Id.* (quoting *Commissioner v. Duberstein*, 363 U.S. 278, 289 (1960)).

The record before us establishes that during 2008 Robert orchestrated the transfers of $1,775,000 and $3,373,000 of Plan #010 funds to the Smiley Trust, and that he also controlled Endearco.  Robert now claims that during 2008 the Smiley Trust made a capital contribution of precisely $1,775,000 to acquire all of Endearco's stock, which it then sold to an unidentified buyer for precisely $3,373,000.  That the amounts involved in these transactions are identical to the amounts of Plan #010 funds transferred to the Smiley Trust cannot be a coincidence.

This intuition is confirmed by Robert's inclusion of the Endearco items that were passed through to him from the Smiley Trust in his

---

[47] Robert calculates the correct result as gain of $1,598,010, which includes the $10 that the Smiley Trust reported as the amount realized from disposing of the preferred shares, but does not take into account the $6,000 basis that the Smiley Trust reported it had in the common shares.

**[*36]** computation of an overall capital loss on his own 2008 return.[48] For individual taxpayers, capital losses are generally deductible only to the extent of capital gains. *See* § 1211(b). If such losses exceed such gains, a limited portion of the excess loss (up to $1,500 for a married taxpayer who files a separate return) is deductible against ordinary income in the year of the loss. *See id.* The remainder of the loss (as adjusted under section 1212(b)(2)) is carried forward indefinitely until it is fully absorbed by offsetting income in future years. *See* § 1212(b)(1). Robert's reporting of the Endearco items thus contributed to his claims for both current and future deductions and permitted him to account (at least superficially) for the large transfers to the Smiley Trust, without incurring any income tax liability as a result.[49]

Robert insists that we must ignore the man behind the curtain and permit him to deduct his manufactured Endearco basis as he intended to do all along. We decline to do so. We recognize, however, that if we were nevertheless to accept Robert's reporting of his gain from the Endearco transactions, that amount would be double-counted in his income as both capital gain and as part of the amount we have held he must include as ordinary income from his misappropriation of Plan #010 funds. We accordingly conclude that neither the loss nor the gain that Robert reported from the Endearco stock transactions has economic substance, and those items must not be included in the computation of Robert's deficiency for 2008.

C.     *Adjustments involving BCH for 2009*

The remaining deficiency adjustments in dispute concern whether Robert or Margaret failed to report income from BCH for 2009.

Respondent contends that some expenditures that BCH made during 2009, which it now concedes it cannot substantiate as ordinary and necessary business expenses deductible under section 162, were in

---

[48] As we indicated *supra* note 3, Robert concedes respondent's disallowance of his claim for a long-term capital loss of $1,950,000 from the MARB transaction, which was the remaining significant component of his capital loss computation. Together, the loss from the MARB transaction and the loss from the Endearco transactions were sufficient to offset all of the reported Endearco gain.

[49] We observe, moreover, that on the record before us it appears likely that the true purpose of the purported contribution to Endearco was to launder the money through Endearco's checking account and obfuscate the fact that the funds Hoiler thereafter deposited into the Davis & Campbell IOLTA Account actually originated from Plan #010. *See supra* note 37. But we need not make a definitive finding on that point to resolve the issues before us.

**[*37]** fact payments of personal expenses incurred by Robert or Margaret. He thus contends that they are includible in income as either employee compensation income to Robert, *see Old Colony Tr. Co. v. Commissioner*, 279 U.S. 716, 729 (1929), or as a constructive dividend to Margaret, *see Combs v. Commissioner*, T.C. Memo. 2019-96, at *10–11, *aff'd*, 859 F. App'x 807 (9th Cir. 2021). Respondent further contends that petitioners have not produced sufficient records for him to determine conclusively the extent to which the expenditures benefited Robert or Margaret individually, or both of them jointly. He admits, however, that the income is taxable only to one of them. *See supra* note 4.

The evidence on this point links Robert to both BCH's income-producing activity in general and to payments of personal expenditures in particular. Robert was the sole officer of BCH during 2009 (and indeed for its entire prior existence dating back to 1990). The record includes copies of checks drawn on BCH's bank account that are signed by Robert and payable to recipients, including medical service providers, hardware and auto parts stores, and a florist, that have no obvious connection to BCH's self-reported business activities of credit intermediation and funding. Moreover, Robert's personal income tax return for 2009 was accompanied by a Form W–2 from BCH for nominal wage income of $1. Together, this evidence shows that Robert exercised control over BCH's funds, expended them for nonbusiness purposes, and intended to cause BCH to pay compensation to himself (even if he may not have intended to report the full amount received on his own income tax return). Respondent has accordingly satisfied his minimal evidentiary burden to connect Robert to unreported compensation income from BCH, and his determination that Robert received such income is presumed correct.

On brief, Robert raises no challenge to respondent's determination except to indicate that he considers the issue in dispute and to note that BCH should receive an offsetting deduction if we decide the issue against him. He has thus failed to carry his burden to prove error in respondent's determination, and we hold that Robert received and failed to report $907,024 of compensation income from BCH for 2009. It follows that BCH is entitled to deduct the amount paid to Robert as compensation as an ordinary and necessary business expense for 2009. *See* § 162(a)(1).

**[\*38]** In view of our holdings with respect to Robert, we do not sustain respondent's alternative determination that the $907,024 constitutes a constructive dividend to Margaret.

II.    *Additions to tax and penalties*

The Commissioner generally bears the burden of production with respect to a penalty or an addition to tax that an individual taxpayer has contested in his or her petition. *See* § 7491(c); *Funk v. Commissioner*, 123 T.C. 213, 216–18 (2004); *Swain v. Commissioner*, 118 T.C. 358, 363–65 (2002). To satisfy that burden, the Commissioner must offer sufficient evidence to indicate that it is appropriate to impose the penalty. *Higbee v. Commissioner*, 116 T.C. 438, 446 (2001).

The Commissioner's burden of production also includes showing compliance with section 6751(b), where applicable, which provides that the "initial determination" of certain penalties must be "personally approved (in writing) by the immediate supervisor of the individual making such determination." *See Graev v. Commissioner*, 149 T.C. 485, 492–93 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016). The Ninth Circuit has held that written supervisory approval must occur "before the assessment of the penalty or, if earlier, before the relevant supervisor loses discretion whether to approve the penalty assessment." *Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1074 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020); *see also Kraske v. Commissioner*, No. 27574-15, 161 T.C. (Oct. 26, 2023).

If the Commissioner satisfies his burden of production, the taxpayer bears the burden of proving it is inappropriate to impose the penalty or addition to tax because of reasonable cause, substantial authority, or a similar provision. *Higbee*, 116 T.C. at 446–47; *see also* §§ 6651(a)(1) and (2), 6664(c); *Wheeler v. Commissioner*, 127 T.C. 200, 206 (2006), *aff'd*, 521 F.3d 1289 (10th Cir. 2008).

A.    *Section 6663(a) fraud penalty asserted against Robert for 2008*

Section 6663(a) imposes a penalty of 75% of the portion of any underpayment of tax required to be shown on a return that is attributable to fraud. As we have noted, the parties have stipulated that the assertion of the section 6663(a) penalty against Robert was properly approved by a supervisor in accordance with section 6751(b).

**[\*39]** Fraud is the intentional wrongdoing of a taxpayer to evade tax believed to be owing. *See Petzoldt v. Commissioner*, 92 T.C. 661, 698 (1989). Fraud is never imputed or presumed. *Parks v. Commissioner*, 94 T.C. 654, 660 (1990). Rather, "[t]he existence of fraud is a question of fact to be resolved upon consideration of the entire record." *Id.* To establish fraud, the Commissioner must prove that (1) an underpayment of tax exists for the relevant year and (2) "the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes." *Id.* at 660–61.

The Commissioner must prove both elements by clear and convincing evidence. *See* § 7454(a); Rule 142(b); *DiLeo v. Commissioner*, 96 T.C. 858, 873 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992); *Petzoldt*, 92 T.C. at 699. The Supreme Court has explained that

> Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

*Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S. 502, 516 (1990) (quoting *Cross v. Ledford*, 120 N.E.2d 118, 123 (Ohio 1954)).

Because direct proof of a taxpayer's intent is rarely available, fraudulent intent may be established by circumstantial evidence, and reasonable inferences may be drawn from the relevant facts. *See Spies v. United States*, 317 U.S. 492, 499 (1943); *Bradford v. Commissioner*, 796 F.2d 303, 307 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-601. The taxpayer's entire course of conduct may be examined to establish the requisite intent. *Stone v. Commissioner*, 56 T.C. 213, 224 (1971); *Otsuki v. Commissioner*, 53 T.C. 96, 106 (1969).

Courts usually rely on several nonexclusive indicia (or badges) of fraud in deciding whether a taxpayer had fraudulent intent. *See Niedringhaus v. Commissioner*, 99 T.C. 202, 211 (1992). These badges of fraud include (1) understated income; (2) maintaining inadequate records; (3) failing to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealing income or assets; (6) failing to cooperate with tax authorities; (7) engaging in illegal activities; (8) dealing in cash; (9) failing to make estimated tax payments; and

**[\*40]** (10) filing false documents. *See Estate of Trompeter v. Commissioner*, 279 F.3d 767, 773 (9th Cir. 2002), *vacating and remanding* 111 T.C. 57 (1998); *Bradford v. Commissioner*, 796 F.2d at 307–08; *Recklitis v. Commissioner*, 91 T.C. 874, 910 (1988).

A taxpayer's professional experience and knowledge of the tax laws can also constitute circumstantial evidence of fraudulent intent. *See Beaver*, 55 T.C. at 93; *Isaacson v. Commissioner*, T.C. Memo. 2020-17, at \*47–48, *aff'd*, 129 A.F.T.R.2d (RIA) 2022-797 (9th Cir. 2022); *Chico v. Commissioner*, T.C. Memo. 2019-123, at \*46–47, *aff'd*, 128 A.F.T.R.2d (RIA) 2021-6266 (9th Cir. 2021).

If the Commissioner establishes that any portion of the underpayment is attributable to fraud, then the entire underpayment is treated as due to fraud unless the taxpayer can establish by a preponderance of the evidence that some portion of it is not attributable to fraud. § 6663(b).

For the reasons we have already described, respondent has clearly and convincingly established that Robert understated his income for 2008, and thus his income tax due for that year, by failing to report his receipt of millions of dollars that he transferred out of Plan #010 and used for his own economic benefit.

Respondent has also clearly and convincingly established the existence of numerous badges of fraud. In her trial testimony the RA explained in detail how Robert failed to cooperate with her.[50] Robert failed to appear for an interview until compelled to do so by summons, and he failed to produce books and records even when summoned. He explained his failure to produce Deerco's books and records by claiming he did not know where they were, even though he was surely aware, as an attorney with expertise in sophisticated tax-related transactions, of every taxpayer's obligation to maintain adequate books and records. *See* § 6001; *Estate of Mason v. Commissioner*, 64 T.C. 651, 656 (1975), *aff'd*

---

[50] Robert contends that we should not credit the RA's testimony. In his view, her request that Mr. Little "backdate" a Form 2848 indicates that she is untrustworthy, and her unwillingness to accept Robert's explanations of issues raised during her examinations reveals a bias against him. We found the RA's testimony credible. What Robert calls backdating might also be called conscientious attention to detail, in that the RA took pains to ensure that there was no ambiguity in the documentation of Margaret's consent to extend the limitations period. She did so, moreover, while the limitations period was still open. Furthermore, Robert's inability to persuade the RA to accept his explanations of particular items does not demonstrate bias on her part.

[*41] *per order,* 566 F.2d 2 (6th Cir. 1977). A number of the documents Robert did produce were false, in that they purported to document loans and wire transfers that, as far as the record reveals, were never made. And he made, at best, minimal efforts to produce bank records within his and his agents' control, even allowing Davis & Campbell to invoke the attorney-client privilege in an attempt to shield records for the Davis & Campbell IOLTA Account from the IRS.

Most significantly, Robert went to considerable lengths to conceal his income and assets. As a general practice, he preferred to work with a specific bank teller who was willing to make transactions for him in a way that would obscure the identity of the originating entity. In the specific context of the Schnadig acquisition and the transfers of funds from Plan #010, he channeled money through multiple bank accounts held at different financial institutions in order to hide the sources and destinations of the funds. He also obscured the identities of the lenders who financed the Schnadig acquisition, and who would ultimately be repaid with Plan #010 funds, by borrowing money through an entity that was not directly involved in the transaction—namely, Medford. He covered up the payment of Plan #010 funds to the Smiley Trust by manufacturing sham transactions involving Endearco stock that he reported on his personal income tax return. And the entire scheme was papered over by a trail of Forms 5500 that created an appearance that Schnadig might simply have restructured its pension plan, but which actually dead-ended into nonexistent plans that never received any of the money that was supposedly transferred to them.

The Employee Plans Examiner's testimony underscores the difficulty that Robert's efforts to conceal the scheme created for the IRS.[51] As she explained, she was able to understand what Robert had done only after issuing numerous summonses for records and then painstakingly tracing the movement of Plan #010 assets.[52]

---

[51] Robert attempts to discredit the Employee Plans Examiner's testimony on grounds that she misstated or misunderstood the applicable law and demonstrated bias against Robert by failing to admit that he could have used a legitimate method to extract funds from Plan #010. We found the Employee Plans Examiner to be a credible witness, and we do not think any misstatement on her part of the complex statutory provisions relevant to the transactions at issue undermines her credibility with respect to the factual matters within her knowledge. Nor do we think that her unwillingness to agree with Robert's proposed theory of the transactions shows any bias against him.

[52] We emphasize that our analysis of Robert's fraudulent intent rests only on the evidence in the record relating directly to the Schnadig acquisition and

**[\*42]** Moreover, the scheme Robert devised was made possible only by his extensive experience in transactions involving qualified plans such as ESOPs. His prominence in the field led the Schnadig shareholders to enlist his services when they sought a buyer for Schnadig's overfunded pension plan, and his expert knowledge of the applicable legal and regulatory framework enabled him to move funds out of Plan #010 in a way that would be difficult for the IRS to discover or trace.

We consequently find that Robert acted with fraudulent intent with respect to his underpayment of income tax for 2008. Robert has not established that any portion of the underpayment is not attributable to fraud. We therefore hold that he is liable for the fraud penalty under section 6663(a) with respect to his entire underpayment for 2008.

B. *Section 6662(a) penalties determined against Robert for 2008 and 2009 and Margaret for 2009 and 2010*

Section 6662(a) and (b)(2) imposes an accuracy-related penalty equal to 20% of any underpayment of tax attributable to a substantial understatement of income tax. A substantial understatement occurs when the difference between the tax shown on the return and the amount required to be shown exceeds the greater of 10% of the amount required to be shown or $5,000. § 6662(d). Generally, the deficiency, understatement of tax, and underpayment of tax for a taxable year are all computed in the same manner. *See* §§ 6211(a), 6662(d)(2), 6664(a).

1. *Robert*

Because we have sustained the section 6663(a) fraud penalty asserted against Robert for 2008, no section 6662(a) penalty can apply to the same underpayment of tax, and we need not address respondent's alternative position that Robert is liable for a section 6662(a) penalty for that year. *See* § 6662(b) (flush language).

For 2009, respondent has produced evidence that the RA's supervisor gave written approval of her determination of a section 6662 substantial understatement penalty before the mailing of the notice of

---

transactions involving assets traceable to Plan #010. We give no weight to the Employee Plans Examiner's belief, based on her review of Continental's records, that Robert engaged in several other similar transactions during 2008, the details of which are not disclosed in the record.

**[\*43]** deficiency to Robert for that year. Respondent has thus satisfied his burden of production under section 6751(b).

Because we have sustained respondent's determination that Robert received unreported compensation income and Robert has otherwise conceded respondent's adjustments, respondent's determination that Robert has a deficiency of $850,037 for 2009 is sustained in full. Since Robert reported a tax liability of zero on his 2009 return, he has understated his tax due by $850,037, exceeding the section 6662(d) thresholds for a substantial understatement. Respondent has thus produced sufficient evidence that it is appropriate to impose the penalty, and the burden shifts to Robert to prove that the penalty should not be imposed.

Robert contends that he is not liable for the penalty because there was reasonable cause for, and he acted in good faith with respect to, the underpayment. *See* § 6664(c)(1); Treas. Reg. § 1.6664-4(a). In support of his position, Robert notes only that he retained the services of advisers, actuaries, corporate counsel, and a certified public accountant to help maintain accurate books and records and properly prepare his tax returns.

We evaluate a taxpayer's claim of reasonable cause and good faith on a case-by-case basis, taking into account all pertinent facts and circumstances. *See* Treas. Reg. § 1.6664-4(b)(1). The most important factor is the extent of the taxpayer's effort to assess the proper tax liability. *Id.* A reasonable cause defense may be established if the taxpayer can show that he or she reasonably relied on the advice of an independent professional adviser as to the tax treatment of an item. *See Sklar, Greenstein & Scheer, P.C. v. Commissioner*, 113 T.C. 135, 144–45 (1999); Treas. Reg. § 1.6664-4(b)(1). To do so, the taxpayer must establish that (1) the adviser's expertise justified the taxpayer's reliance, (2) the taxpayer gave necessary and accurate information to the adviser, and (3) the taxpayer relied in good faith on the adviser's judgment. *See Sklar, Greenstein & Scheer, P.C.*, 113 T.C. at 144–45.

Robert has failed to prove his defense. He has not identified any specific professional among those he retained who advised him with respect to any specific item giving rise to his underpayment for 2009. Nor has he described what information he may have provided to any such adviser or attempted to show that he actually relied on any advice he may have received. We therefore sustain the accuracy-related penalty for 2009.

**[*44]** 2. *Margaret*

For Margaret's taxable years 2009 and 2010 respondent has produced evidence that the RA's supervisor gave written approval of her determination of accuracy-related penalties before the mailing of the notice of deficiency for those years. Respondent has thus satisfied his burden of production under section 6751(b).

Because we do not sustain respondent's determination that Margaret received unreported income from BCH for 2009, the amount of the deficiency determined against Margaret for that year will be adjusted in the parties' computation for entry of decision under Rule 155. Respondent's burden of production as to 2009 will be satisfied if the Rule 155 computation shows an underpayment and a substantial understatement of income tax.

For 2010 Margaret concedes respondent's adjustments, and we thus sustain his determination that Margaret has a deficiency of $91,196. She accordingly underpaid her tax by more than 10% of the total tax due, which was $92,049, exceeding the thresholds for a substantial understatement under section 6662(d). Respondent has therefore produced sufficient evidence to show that the penalty is appropriate.

To the extent that Margaret contends that she had reasonable cause for, and acted in good faith with respect to, the underpayments for 2009 and 2010, her position appears to be that she relied on the same advisers that Robert retained. But, like Robert, she has identified no specific advice she received that could support a reasonable cause defense. We accordingly sustain the accuracy-related penalty for 2009 to the extent that the Rule 155 computation shows a substantial understatement of income tax, and we sustain the accuracy-related penalty for 2010 as determined in the notice of deficiency.

C. *Section 6651(a) additions to tax determined against Robert and Margaret for 2010*

Section 6651(a)(1) imposes an addition to tax if a taxpayer fails to file his or her income tax return by the required due date (including any extension of time for filing). The addition is equal to 5% of the amount required to be shown as due on the return for each month (or portion thereof) after the due date, up to a maximum of 25%. To carry his burden of production with respect to a section 6651(a)(1) addition to tax, the Commissioner must introduce evidence showing that a return was

**[\*45]** filed after the due date.  *See Wheeler*, 127 T.C. at 207–08; *Higbee*, 116 T.C. at 447.

Section 6651(a)(2) imposes an addition to tax for failure to pay timely the amount of tax shown as due on a return, equal to 0.5% of the amount shown as due on the return for each month (or portion thereof) that the failure to pay persists, up to a maximum of 25%.  To satisfy his burden of production with respect to an addition to tax under section 6651(a)(2), the Commissioner must produce evidence that a return, or a substitute therefor, was filed showing the tax liability for the year at issue.  *See Wheeler*, 127 T.C. at 210.

Supervisory approval is not required for determinations of additions to tax under section 6651.  § 6751(b)(2)(A).

### 1.  *Robert*

Respondent determined additions to tax for Robert's taxable year 2010 under both section 6651(a)(1) and (2).

For calendar year taxpayers, individual income tax returns for 2010 were due in April 2011, and any extension for filing the return would have expired in October 2011.  *See* §§ 6072(a), 6081(a).  Robert failed to file his 2010 return until 2014.  Respondent has thus met his burden of production as to the section 6651(a)(1) addition to tax.  Robert has abandoned any challenge to respondent's determination, as he has advanced no argument on brief that the failure to file his return was due to reasonable cause and not willful neglect.  *See Davis*, 119 T.C. at 1 n.1.  Respondent's determination under section 6651(a)(1) is therefore sustained.

Robert's 2010 return reported his tax due as zero.  Although respondent suggests that the notice of deficiency was prepared before Robert filed his delinquent 2010 return, he also acknowledges that the notice of deficiency takes into account items reported on Robert's delinquent return.  In any event, respondent has not produced a copy of any substitute for return on which the notice of deficiency could have been based.  Respondent accordingly has not produced evidence that Robert failed to pay a tax reported as due on a return, and the section 6651(a)(2) addition to tax is not sustained.

**[\*46]**          2.     *Margaret*

Respondent determined an addition to tax for Margaret's taxable year 2010 under section 6651(a)(1) only.  Like Robert, Margaret did not file her 2010 return until 2014, and she has abandoned any challenge to that addition to tax on brief.  Respondent's determination is therefore sustained.

III.    *Conclusion*

Respondent has proven by clear and convincing evidence that Robert failed to report income for 2008 consisting of millions of dollars of misappropriated pension plan funds, and that he attempted to evade tax on that income by hiding it in a maze of attenuated financing arrangements, misleading documents, wire transfers among multiple bank accounts and financial institutions, and stock transactions lacking economic substance.  Robert is consequently liable for a fraud penalty under section 6663(a) for 2008.

In addition, we sustain respondent's determinations in the notices of deficiency underlying these cases except to the extent that (1) we have concluded that the Endearco stock transactions reported on Robert's return for 2008 must be disregarded, (2) we have concluded that Margaret did not receive a constructive dividend for 2009, (3) we have concluded that BCH is entitled to a deduction for employee compensation paid to Robert in 2009, (4) respondent has conceded an adjustment to BCH's income for 2010, and (5) we have concluded that Robert is not liable for an addition to tax under section 6651(a)(2) for 2010.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*